FILED

08/25/2020

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 25, 2020 Session

## STATE OF TENNESSEE v. DOYLE WAYNE MASON, JR.

**Appeal from the Criminal Court for Knox County**
**No. 109267     Steven W. Sword, Judge**

### No. E2019-00174-CCA-R3-CD

The Defendant, Doyle Wayne Mason, Jr., was convicted by a jury of one count each of aggravated sexual battery, solicitation of a minor, and sexual battery by an authority figure; and eleven counts each of statutory rape by an authority figure, incest, and rape. The trial court imposed an effective sentence of fifty-two years' incarceration. On appeal, the Defendant argues that (1) the evidence was insufficient to support his convictions for aggravated sexual battery, solicitation of a minor, and rape; (2) a material and prejudicial variance existed between the bill of particulars and the State's election relative to the aggravated sexual battery count; (3) the court "took on the role of the prosecutor" by questioning the victim and inadvertently conveyed to the jury that the court found the victim credible; (4) the court erred by admitting hearsay evidence that the victim reported the abuse to others; and (5) the sentence imposed by the court was excessive. After a thorough review of the record and applicable law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Mark E. Stephens, District Public Defender, and Jonathan Harwell, Assistant Public Defender (on appeal); and Michael L. Debusk (at trial) Knoxville, Tennessee, for the appellant, Doyle Wayne Mason, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Charme P. Allen, District Attorney General; and Rachel Russell and Joanie Stewart, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
FACTUAL BACKGROUND

This case arises out of the Defendant's sexually abusing his minor stepdaughter, A.L.,[1] from 2012 to 2016, when A.L. was between eleven and fifteen years old and the Defendant was between thirty-two and thirty-five years old. In June 2016, A.L. disclosed the abuse to her mother and grandmother. Thereafter, the November 2016 term of the Knox County Grand Jury indicted the Defendant on the following charges: one count of aggravated statutory rape; one count of solicitation of a minor; three counts of sexual battery by an authority figure; and eleven counts each of statutory rape by an authority figure, incest, and rape. See Tenn. Code Ann. §§ 39-13-503(a)(1); -13-504(a)(4); -13-527(a); -13-528(a)(8); -13-532(a)(3)(A); -15-302(a)(1).

## 1. Contextual Evidence

At trial, A.L and her mother, R.M., testified regarding their family history and the context in which the abuse occurred. A.L. was born in Illinois in May 2001; R.M. separated from A.L.'s father about one year later; and R.M., A.L.'s older half-brother, and A.L. subsequently relocated to Virginia. R.M. met the Defendant there in 2004, when A.L. was almost three years old. The Defendant lived with the family for two years before he and R.M. married in April 2006. Both R.M. and A.L. stated that the Defendant was a father figure to A.L. and that A.L. only saw her father during visits to Illinois in the summer and at the Christmas holidays.

In August 2007, R.M. and the Defendant bought a house in Knoxville and moved there. The family house had three bedrooms and two bathrooms. A.L. slept in the smallest bedroom; A.L.'s half-brother slept in the second bedroom; and R.M. and the Defendant shared the master bedroom.

The Defendant worked at a Knoxville tire shop, where R.M. also obtained employment. The Defendant and R.M. reported to work at 5:00 a.m.; R.M. left work between two and four o'clock each day, but the Defendant generally worked until later in the afternoon. R.M. stated that three days per week, another employee worked until 4:00 p.m. and that on the remaining two days per week, the Defendant was alone after R.M. left.

In the summers of 2012 and 2013,[2] A.L. remained in Knoxville and was at the tire shop during the day; A.L. stayed in the office building in the room that overlooked the tire shop. R.M. noted that they created a bedroom for A.L. in the office, including a recliner and an air mattress.

---

[1] It is the policy of this court to refer to minors and victims of sexual offenses by their initials. To further protect A.L.'s privacy, we will also refer to her mother, R.M., by her initials.

[2] These years correspond to R.M.'s description, which was that A.L. spent both summers at the tire shop between fifth and sixth grade and sixth and seventh grade.

R.M. testified that after A.L. began middle school, their relationship deteriorated; at the same time, A.L. began growing closer to the Defendant. A.L. characterized her relationship with R.M. as "[n]ot very good" and stated that she "felt pretty alone" because R.M. was not "there for [her]" as much as she should have been. R.M. testified that she believed A.L.'s distancing herself was typical teenage behavior. Both A.L. and R.M. affirmed that R.M. enjoyed a close relationship with A.L.'s half-brother, that A.L. felt as though R.M. treated him better than A.L., and that A.L. felt neglected by R.M. A.L. acknowledged that R.M. came to one of her softball practices intoxicated and that A.L. was embarrassed. A.L. agreed that she felt estranged from R.M. due to R.M.'s conduct.

R.M. testified that she first became suspicious of the nature of the Defendant's relationship with A.L. after R.M. and the Defendant separated in May 2015; however, R.M. also stated that when A.L. was about twelve years old, A.L.'s father "swore up and down that she was being sexually active because the way she was on her phone." As a result, R.M. took A.L. to a gynecologist, who told R.M. that "everything was fine and intact, that she hadn't had sexual intercourse." R.M. took A.L. to a similar appointment when she was fourteen years old with the same result. A.L. denied being sexually active at both appointments; she testified that she believed the doctor referred only to "actual sex," meaning vaginal intercourse.

R.M. testified that when A.L. was in sixth grade, R.M. began returning to the house unannounced to determine whether anything inappropriate was occurring between the Defendant and A.L. R.M. stated that the front door was typically locked with a dead bolt or a "slide lock" such that R.M. had to "beat on the door" to enter the house. R.M. asked the Defendant multiple times if he was cheating on her. The Defendant swore that "nothing was ever going on," even though he had long telephone conversations with other women.

According to R.M., during A.L.'s visit to Illinois in the summer of 2014, A.L. told R.M. that she wanted to stay with her grandmother instead of her father. A.L. complained to R.M. that she did not have her own bedroom at her father's house and that her father had "walked in on her" while she was taking a shower. A.L. stated that she had no privacy and felt trapped there. R.M. affirmed that the previous summer, A.L. and her father had a "pretty big argument."

A.L. also testified regarding an argument with her father in which he confronted her about her relationship with the Defendant. A.L. stated that her father was angry and that she was scared and unsure what to do. A.L. did not disclose the abuse at that juncture because she was "scared and confused, and [the Defendant] told [her] never to tell anyone." After that summer, A.L. began to stay with her grandmother.

R.M. testified that although she inspected the family's cell phone records and saw documentation of calls and text messages between the Defendant and A.L., R.M. never

found corresponding messages on either cell phone. R.M. opined that the Defendant deleted his messages and that A.L. deleted call logs and text messages before handing R.M. her cell phone. R.M. stated that A.L. placed a password lock on her cell phone in eighth grade; although R.M. was generally able to guess the Defendant's password, after they separated, he never "let his phone out of his sight."

The Defendant and R.M. separated in 2015; R.M. remained in the marital home for financial reasons, and the Defendant told R.M. that he wanted to stay in the home until A.L. graduated from high school. Although R.M. began a romantic relationship with another man, she and the Defendant shared the master bedroom until A.L.'s half-brother moved out in January 2016. However, A.L. testified that R.M. moved out of the Knoxville house on A.L.'s fourteenth birthday in May 2015. R.M. stated that she "very occasionally" spent the night at her boyfriend's house during the week and that she and her boyfriend went to Virginia most weekends to renovate the house R.M. and the Defendant still owned there.

R.M. testified that she "beg[ged]" A.L. to come to Virginia with her and that A.L. refused, citing the lack of internet and television at the Virginia home and A.L.'s desire to be in Knoxville where her "life" was. R.M. said that she understood A.L.'s position and that she believed A.L. was safe and happy at home with the Defendant.

R.M. testified that her relationship with the Defendant was friendlier after they separated and that she brought up the possibility of reconciling. According to R.M., the Defendant was not interested and told her that he wanted to wait before discussing reconciliation, citing his satisfaction with their improved dynamic and his desire that R.M. have the opportunity to fully explore her relationship with her new boyfriend.

R.M. also testified, though, that she became suspicious of the Defendant's relationship with A.L. during this time and that she noticed "a difference in" A.L. R.M. gave examples of A.L.'s behavior, including A.L.'s sitting "literally . . . right up on top of" the Defendant on the couch; spending more time at the tire shop; being willing to go to the grocery store and other places with the Defendant but not with R.M.; being "more involved in what [the Defendant] was doing versus what she should have been doing"; being disinterested in spending time with friends and doing "teenage things"; and being "locked to her phone" when she spent time with R.M. When R.M. asked A.L. with whom she was communicating, A.L. said a person named "D.J."[3]

R.M. testified that on one weeknight in early 2016, she went to the Knoxville house from her boyfriend's house before reporting to work. When R.M. entered the front door

---

[3] A.L. testified that she called the Defendant "D.J."; the police investigator also referred to the Defendant as D.J. during his interview.

around 3:30 a.m., she saw A.L. coming out of the master bedroom, where the Defendant was still sleeping. R.M. stated that A.L. was wrapped in a large blanket. R.M. confronted both A.L. and the Defendant; A.L. claimed that she was sleeping on the couch, heard a sound, and went into the master bedroom to look out the front window. R.M. stated that A.L. never fell asleep on the couch and always slept in her own bed.

R.M. testified that when she asked A.L. and the Defendant about "what was going on between the two" of them, they told her that she was crazy for thinking they would "do something together," and that they just had a close relationship because A.L. was not close with her father. R.M. recounted multiple instances in which she questioned A.L. and the Defendant about their behavior, and R.M. accepted their innocent explanations.

R.M. acknowledged that she and the Defendant were in the process of divorcing and that she and the Defendant had fought about money during the proceedings. R.M. denied telling the Defendant that he would "regret" not reconciling with her or that she would take everything he had.

## 2. A.L.'s Testimony

A.L. testified that she confided in the Defendant, told him secrets, and discussed things with him about which she was uncomfortable speaking to R.M. She stated that she spent time alone with the Defendant when she was growing up, that she trusted the Defendant more than she trusted R.M., and that she looked up to the Defendant. A.L. stated that she wanted "just a dad" because she did not see her father often and that she did not anticipate having a romantic relationship with the Defendant. A.L. testified that her relationship with the Defendant began to change when she was about eleven years old, and she described two "games" that the Defendant played with her when they were alone at home.

### a. Picture Game

The first game, which A.L. called the "picture game," occurred when she was in sixth grade.[4] The game consisted of one person's taking a photograph of a body part in the bathroom using a handheld Nintendo device; the other person would view the photograph in the living room and guess which part it was. The players could not photograph a body part twice. Eventually, the Defendant showed A.L. a photograph of his penis. At some point thereafter, A.L. ran out of obvious body parts to photograph. The Defendant told her, "You know, there's something else that you haven't taken a picture of." A.L. understood

---

[4] Upon questioning by the trial court, A.L. stated that she was in eleventh grade at the time of trial in January 2018, and that she would turn seventeen in May 2018. She had never repeated a grade. As a result, A.L. was eleven years old during her sixth grade year until May, when she turned twelve.

the Defendant's statement to mean that he wanted her to photograph her breasts. As a result, A.L. photographed her bare breasts and showed the photograph to the Defendant. A.L. stated that the incident made her feel "[v]ery uncomfortable" but that she did not discuss it with the Defendant.

When asked why she took the photograph, A.L. said, "I wasn't sure what was going on and I didn't really know much about it." According to A.L., the Defendant looked at the photograph and never indicated that it was not what he wanted or that he "did not want [her] to reciprocate in this fashion."

### b. Shower Game

A.L. testified that the second game she and the Defendant played was called the "shower game"; A.L. described it as "hide and go seek and tag put together." A.L. stated that on one occasion when she was eleven or twelve years old, she was taking a shower when the Defendant came in and grabbed her without warning. She said that she felt "very confused and kind of violated[.]" She said that as time progressed, she came to understand the "rules of the game," although the Defendant never articulated them explicitly. After the first time, the Defendant would ask if she was "ready" and come in and "try to grab one of [her] body parts in the shower"; one of the rules was that the Defendant could not look inside the shower curtain. A.L. stated that the shower game only happened "on[c]e in a while." A.L. said that the shower game began after the picture game in which she showed the Defendant a photograph of her breasts.

A.L. testified that during the shower game, the Defendant sometimes grabbed her arm or leg, but that on more than one occasion, he grabbed A.L.'s breast. A.L. stated that when the Defendant grabbed her breast, it was not the first time the game occurred. The Defendant said, "I got you," walked out, and did not apologize or indicate that the touching was accidental. A.L. did not believe the Defendant's grabbing her breast was accidental; however, because the Defendant was not supposed to look behind the shower curtain, A.L. could not be certain that the Defendant acted intentionally. A.L. noted that the shower game "stopped and then turned into something more than that as [she] got older." She said that she was about twelve years old when the game stopped. A.L. noted that initially, she was unsure whether she and the Defendant were in a relationship.

### c. Kissing and Sexual Touching

A.L. testified that after the shower game ended and when she was twelve or thirteen years old, the Defendant began kissing her on the lips; however, A.L. also testified that the kissing started when she was eleven or twelve years old. According to A.L., they were usually in the living room when the Defendant kissed her, and this sometimes occurred when she sat next to the Defendant on the couch while they watched television. During

this time period, the Defendant conveyed to A.L. that they were boyfriend and girlfriend and that being boyfriend and girlfriend meant they "were supposed to do sexual things together." A.L. stated that she "wasn't sure, but [she] just did it because that's what he told [her]." A.L. affirmed that she trusted the Defendant and that he was like a father to her.

A.L. testified that when she and the Defendant started kissing, the Defendant told her to keep their relationship secret because he would get in trouble if anyone found out about it. A.L. stated that she trusted the Defendant and thought "what he was telling [her] was all right, and that it was okay, 'cause [she] wasn't really sure about anything 'cause [she] was so young." She stated that she wanted to tell others and thought it was "odd" that she could not; she said, though, that she "was so used to the fact of him being around, [she] couldn't think of him not being around. It was hard to think about."

When asked whether A.L. understood the significance of the dates of the sexual incidents, A.L. responded, "Yes, but it's very hard for me to remember because it's been almost two years and I have tried to forget[,] . . . and it happened so much that I can't remember like exactly. That's why I have to give such a big time frame." She acknowledged her statement to the Child Help interviewer that the first "sexual stuff" began when the Defendant kissed her, that the kiss was a "peck on the lips," and that she was uncertain whether it occurred before her thirteenth birthday. When asked whether, in light of her statement to Child Help, "everything else had to [have] occur[ed]" after she turned thirteen, A.L. responded that the "games started first," then "it evolved to kissing and then other sexual things[.]" A.L. reiterated that the shower game and the kissing occurred before she turned thirteen.

A.L. further testified that when she was twelve or thirteen years old and in seventh grade, she and the Defendant "started doing sexual things." A.L. stated that the first sexual activity was A.L.'s manually stimulating the Defendant's penis until he ejaculated and that this type of activity occurred about three times. A.L. stated that all three incidents occurred during the school year; she could not recall whether any of them occurred after her thirteenth birthday in May.

A.L. testified that on the first occasion, she was sitting on the floor in the living room and the Defendant was on the couch. She said that the Defendant "kind of just pulled his penis out, and [she] reached over and put [her] hand on it[.]" A.L. noted that the Defendant grabbed her wrist and "kind of guided [her]" movements because she had never touched a penis before and did not know what to do. A.L. saw the Defendant ejaculate; she said that during this type of incident, the Defendant typically went to the bathroom, cleaned himself, and returned to watch television with A.L.

A.L. testified that the first time the Defendant touched her breasts after the shower game incidents was a "little bit before" he began to touch her vaginal area. She stated that

the Defendant touched her breasts in the living room when she was in sixth grade on an occasion when they were "making out" on the larger couch. The Defendant touched A.L.'s breast over her clothes, then put his hand underneath her clothing and touched her bare breast.

She stated that "[e]very once in a while when [they] were doing things" after she turned thirteen, the Defendant touched her breast. She noted that when they were in the living room, the Defendant would kiss down her neck to her breasts while touching her breasts, that sometimes things would "stop there," and that sometimes "other things would happen too." A.L. agreed that on some occasions, the touching would accompany fellatio and that other times, the touching would occur without fellatio because her mother arrived home.

A.L. recalled a specific incident after she turned thirteen when the Defendant touched her breasts. A.L. and the Defendant were watching television in the living room at nighttime; the Defendant was touching A.L.'s breasts; R.M. was supposed to be traveling to Virginia but came home unexpectedly; A.L. and the Defendant heard a car door slam outside; and the Defendant got up, looked out the window, and said, "Your mom's home."

### d. *Digital Penetration/Fellatio/Cunnilingus*

#### i. Incidents in the House

A.L. testified that after the Defendant began to touch her breasts, he began to rub her vagina with his hand. She stated that the Defendant never rubbed her vagina over her clothing, that it was always "skin to skin," and that he never only touched the outside of her vagina.

A.L. explained that the first time the Defendant touched her vagina, she was in seventh grade between the time during which she manually stimulated the Defendant's penis and the time she began fellating him. She did not recall the Defendant's saying anything to her beforehand. A.L. was sitting beside the Defendant on the couch watching television, and no one else was home. A.L. was wearing pajamas or "loose clothes," and the Defendant reached inside her clothes and touched her vagina until A.L. reached orgasm. She reiterated that the Defendant's fingers always went inside her vagina.

A.L. stated that the Defendant also touched her vagina in the living room or in her bedroom. She recalled two particular incidents when the Defendant touched her vagina while she was in bed.

A.L. testified that after the manual stimulation occurred three times, the Defendant "said that it wasn't doing enough for him" and that as a result, they "moved on" to fellatio.

The instances of fellatio began when A.L. was still in seventh grade. A.L. testified that the fellatio usually occurred in the living room, but that it also occurred in the Defendant's shower, on "a couple" of occasions in A.L.'s bedroom when she was trying to sleep, at the Defendant's workplace, and in the Defendant's truck.

A.L. stated that the first incident of fellatio occurred in the living room. A.L. denied that the Defendant said anything to her before the fellatio started. She stated that she was "very confused," that the Defendant showed her a video of people engaging in fellatio, and that the Defendant put his hand on the back of A.L.'s head and "tried to guide [her] how to do it" by moving her head up and down while his penis was inside her mouth. A.L. stated that the Defendant ejaculated into a napkin, went to the bathroom, and returned to watching television. A.L. said that the fellatio occurred almost three times per week for about three years until she disclosed the abuse.

A.L. testified that she remembered an occasion after she turned thirteen during which the Defendant got up from the living room and retrieved napkins from the kitchen before A.L. performed fellatio on him. They did not kiss before the fellatio on this occasion. She stated that this incident happened during the daytime between "morning and lunchtime," that the Defendant complained that A.L. was "not giving [fellatio] to him enough[,] . . . and [that she] would eventually give him [fellatio] just to make him happy."

A.L. testified that on one occasion when she was fourteen or fifteen, the Defendant performed cunnilingus on her in the living room. A.L. recalled that during this incident, "apparently there [were] church people" who came to the door and that the people left a pamphlet or other materials on the fence. A.L. stated that the Defendant later asserted that the church people "heard [A.L.] and that's why they . . . didn't continue to knock on the door."

ii.     Incidents in the Shower

A.L. stated that she began showering in the larger bathroom in seventh or eighth grade because the Defendant wanted to do "[s]exual things" in the shower and his shower was larger than the one A.L. used. A.L. said that when R.M. was not at home, A.L. would get into the shower first; the Defendant would get into the shower with A.L.; they would kiss; the Defendant sometimes rubbed A.L.'s vagina with his hand; and A.L. would fellate the Defendant. A.L. estimated that the fellatio occurred fifteen to twenty times and that the Defendant rubbed her vagina five to ten times.

Specifically, A.L. recounted one incident of fellatio in the shower that was consistent with the pattern she described, during which the Defendant ejaculated down the shower drain. A.L. recalled a second incident in the shower, which occurred in seventh or eighth grade and was otherwise consistent with the pattern she described. A.L. stated that

during the incident, she and the Defendant kissed, she performed fellatio on the Defendant, and then the Defendant rubbed her vagina with his hand. A.L. affirmed that the Defendant's fingers went inside "the lips of [her] vagina." A.L. recalled a third incident occurring after her thirteenth birthday when she was in eighth grade, during which she fellated the Defendant while he was standing up in the shower and she was kneeling; she stated that afterward, he dried her off with a towel. A.L. noted that it was nighttime and that they were alone in the house.

A.L. recalled a fourth incident in which the Defendant rubbed her vagina while both she and the Defendant were standing in the shower. A.L. recalled a fifth incident in which the Defendant rubbed her vagina; however, on this occasion, she was standing in the shower while the Defendant stood outside the shower. She affirmed that the Defendant's fingers went inside her "vaginal area" on both occasions.

iii.    Incidents at the Tire Shop

When A.L. began high school, the Defendant decided that her behavior and grades were such that she did not have to ride the school bus; instead, the Defendant or R.M. drove A.L. to school, and the Defendant picked up A.L. after school. On the days that A.L. had no softball-related activities, the Defendant took A.L. back to work with him.

A.L. testified that beginning in eighth grade, she went to the Defendant's workplace after school. She stated that other employees left within thirty minutes of her arrival, including R.M. A.L. said that generally, she sat in the break room at a lunch table and that after the other employees left, the Defendant went to the bathroom, cleaned his penis, and collected napkins from the kitchen area. A.L. noted that the Defendant was not circumcised[5] and that as a result, the folds of his penis smelled bad. A.L. stated that after she complained to the Defendant, he began to clean his penis before fellatio.

A.L. stated that she knelt on the floor and that the Defendant sat in a chair during the fellatio. A.L. noted that even though they were alone in the tire shop, the Defendant generally locked the break room door. A.L. stated that the fellatio occurred in the break room between fifteen and thirty times.

A.L. described a particular incident that was consistent with the pattern she described, which occurred on a day she did not have softball practice. She stated that the Defendant ejaculated into a napkin and threw it into a garbage can.

A.L. testified that on between three and five occasions when she was in eighth or ninth grade, the Defendant performed cunnilingus on her in the tire shop break room. A.L.

---

[5] R.M. confirmed that the Defendant was not circumcised.

said that on an occasion when she was in eighth grade, she had finished performing fellatio on the Defendant and laid back on the floor; the Defendant then pulled down her pants and underwear and licked her vagina. A.L. stated that the Defendant's tongue went inside the lips of her vagina. The Defendant stopped when A.L. reached orgasm. A.L. went to the bathroom and cleaned herself up. A.L. stated that generally, after the sexual encounter, they would leave or the Defendant would resume working.

A.L. testified that when she was in the office space above the tire shop, she fellated the Defendant between five and ten times while he sat on the couch and that he performed cunnilingus on her between three and five times while she was on the air mattress. Although A.L. could not recall how old she was during these incidents, she stated that it was summertime, that her half-brother had moved out of the home, and that she was too young to stay home alone. A.L. said that the Defendant would come upstairs during his lunch break or after the other employees left, that he brought napkins with him, and that he would sit on a chair and pull out his penis while A.L. knelt on the ground. A.L. denied that anyone could see them through the window overlooking the tire shop. A.L. stated that the Defendant performed cunnilingus on her after the employees left in the afternoon because there was not time for this activity during the Defendant's lunch break. She agreed that he locked the door when the sexual activity occurred. She noted that she was typically wearing pajamas because the Defendant and R.M. reported to work very early in the morning.

A.L. testified that on one occasion, after she fellated the Defendant, she laid down on the air mattress and the Defendant pulled down her pants and underwear before performing cunnilingus on her. She affirmed that the Defendant's tongue went inside the lips of her vagina. A.L. said that after it was over, she went to the bathroom in the break room and they went home. A.L. stated that once or twice, the Defendant performed cunnilingus on her in the tire shop office.

A.L. stated that one of the times she performed fellatio on the Defendant in the tire shop break room, she was in eighth grade; it happened after school on a day she did not have softball practice; and she went home afterward.

A.L. testified that when she performed fellatio on the Defendant in the upstairs office, she was in eighth grade; she had turned fourteen; and she had already performed fellatio on the Defendant in the living room at this time. She agreed that it occurred during the Defendant's lunch break; he locked the door; he brought napkins with him; other employees were present in the tire shop; none of the people in the tire shop could see A.L. performing fellatio; the Defendant ejaculated into a napkin; and when it was over, the Defendant returned to the tire shop. A.L. did not recall whether the Defendant cleaned himself up afterward; she noted that she did not watch him walk back into the tire shop and

that she could not see the downstairs bathroom from the office window overlooking the shop.

A.L. testified that on one occasion when the Defendant performed cunnilingus on her in the upstairs office, she did not go to the tire shop bathroom afterward because another employee was present. She stated that she had napkins in the office and used those to clean herself up before throwing them away in a garbage can inside the office.

iv. Incidents in the Defendant's Truck

A.L. testified, and R.M. confirmed, that the Defendant became a coach for A.L.'s recreational league softball team and that he drove A.L. to and from the practices and games. R.M. sometimes attended A.L.'s softball games, but the Defendant always transported A.L. separately.

A.L. testified that when she was in eighth grade, she fellated the Defendant between five and ten times in his truck while they drove home from her softball practices. She agreed that the Defendant was coaching her team during the time. A.L. stated that generally, the Defendant would stop at a gas station; clean his penis in the bathroom and keep a paper towel; drive down "back roads where it was darker"; pull out his penis while driving; and A.L. would perform fellatio on him.

A.L. recalled one specific incident that occurred at night. She was fellating the Defendant on a "really dark road" with sharp turns, and when the Defendant turned the car, his penis would go deeper into A.L.'s mouth. A.L. stated that she believed the Defendant took sharp turns intentionally because "it felt better for him." She said, though, that they did not discuss it. The Defendant would generally ejaculate into a paper towel or napkin from the gas station and throw it out the truck's window.

*e. Anal Penetration*

A.L. testified that when she was fourteen but "very close" to her fifteenth birthday, the Defendant anally penetrated her with his penis. She stated that this occurred between five and ten times. A.L. said that the Defendant had "talked about it a lot" and had "always wanted to do it." While they were in the living room, A.L. knelt on the floor with her elbows leaning on the big couch. The Defendant bought a condom and personal lubricant, "put the condom on and . . . put lube everywhere," and began to anally penetrate A.L. A.L. stated that on the first occasion, she felt the penetration, but she "didn't know the feeling or anything and it was something new." She noted that neither she nor the Defendant "knew like what was going on" and that the penetration lasted only two minutes. A.L. said that after two attempts, the Defendant stopped using condoms because "he thought it would make it easier." She stated that he continued to use lubricant. A.L. said

that she felt "[s]cared and nervous" and "didn't like it at all." She stated that she told the Defendant about her feelings and that he continued to anally penetrate her until she went to Illinois to visit her family. A.L. identified a bottle of personal lubricant entered into evidence as the one the Defendant used.

A.L. testified that the first time the Defendant anally penetrated her, it was about two weeks before her fifteenth birthday; he told her that he was going to use a condom to avoid his semen's "accidentally slip[ping]" into A.L.'s vagina and getting her pregnant; and that she heard him open the condom wrapper, although she did not watch him put it on. A.L. noted that the Defendant told her he would get "in really big trouble" if A.L. became pregnant because she was not eighteen years old. A.L. stated that the anal penetration hurt.

A.L. testified regarding a specific incident in which anal penetration occurred and the Defendant did not wear a condom. She stated that it occurred after her fifteenth birthday in the living room during a weekend when R.M. was out of town, that she and the Defendant were positioned similarly to the first time it happened, that the Defendant used lubricant, and that they watched television beforehand. A.L. said that the Defendant kept the lubricant in his top dresser drawer in his bedroom.

A.L. testified that she and the Defendant never had vaginal intercourse because the Defendant wanted to avoid getting in trouble for having sex with a minor. A.L. noted that she "had gotten checked a lot from the doctors" and that she was under the impression that "it could have gotten . . . tracked back to him if anyone would have found out." A.L. agreed that the Defendant discussed that he "wasn't allowed to do it."

A.L. testified that she and the Defendant discussed their future and "what was going to happen" after A.L. turned eighteen. She stated that the Defendant told her they would have their own house, build a life together, and have two children, whom they named Jarayiah and William. A.L. said that she was skeptical "because [she] didn't think at that young of an age [that she] should already have [her] life planned out[.]" A.L. noted that she did not believe she had lived enough life to think about "that stuff." When asked whether the Defendant's plan was what she wanted, A.L. replied, "Not really." However, A.L. believed that if she had not disclosed the relationship before she turned eighteen, the events in the Defendant's plan would have occurred.

When A.L. realized that R.M. had proof that could "get [the Defendant] in trouble," A.L. decided to tell her grandmother and R.M. about the abuse. A.L. noted that she "finally had someone to talk to about it and [she] could finally open up and realize what all in the wrong [sic] was going on." A.L. stated that after she disclosed the abuse, she made a statement to police in Illinois and later at Child Help in Knoxville. She stated that she told

-13-

the interviewer the truth to the best of her ability and averred that her trial testimony was truthful.

A.L. testified that at the time of the trial, she had a "very healthy relationship" with R.M. and her father. She stated that since she disclosed the abuse, her relationship with both of her parents had improved; she agreed that the improved relationship with her parents was "what [she] wanted."

### 3. Exhibits

Several exhibits were introduced into evidence documenting the Defendant's relationship with A.L., including drawings and notes from a computer tablet, two rings, photographs of text message conversations, condoms, and two bottles of personal lubricant. R.M. gave the respective pieces of evidence to Knoxville Police Investigator Patricia Tipton during her investigation.

#### i.    *"Love me forever" drawing, tablet messages*

A photograph depicted an electronic note on a computer tablet, which was in pink lettering that appeared to have been written with a finger or stylus, read, "Love me forever[,] no one else[,] Doyle Jr[.] [A.L.] Jarayiah William Mason family[.]" R.M. identified A.L.'s handwriting in the photograph. A.L. identified the note and agreed that it contained the names of her potential children with the Defendant.

Another photograph showed what appeared to be a screen shot from a video call. R.M. and A.L. identified the Defendant in the screen shot; the Defendant was "puckering" his lips and making a sideways "v" with his fingers framing his mouth. A.L. and R.M. identified A.L. in a small box in the corner of the screen, which reflected the other person on the video call. A.L. explained that she and the Defendant would video chat while they were alone in the house.

A.L. identified yet another screen shot, which contained a note dated December 3, 2015. A.L. stated that she wrote the note on the Defendant's computer tablet when he went on a business trip and that the note contained their future children's names. The note read as follows:

> just wanted u to know I'm missing you bunches and I wanted to leave u this
> to[6]. . . u smile because I love you thAt much  I know ur probably getting tired
> of mom and stress[7] out but just remember jariah and William parents under

---

[6] A word was cut off at the margin of the photograph.

[7] Letters were cut off at the margin of the photograph.

the same roof[8] . . . women at home to keep u happy and put food in that belly
I love u so and I'm mis[9] u bunches love u infinity and beyond  -A

*ii.   Rings*

R.M. testified that in summer 2014, she went to Illinois to visit A.L., and the Defendant asked her to give a pair of tennis shoes to A.L.  Upon closer examination, R.M. discovered a ring wrapped in a tissue inside one of the shoes; the ring "said 'love' with a little diamond in the O part."  Upon questioning by R.M., the Defendant said that he wanted A.L. to have the ring and that he intended to tell R.M. about it when A.L. returned home.  R.M. stated that the ring was the first piece of jewelry the Defendant had ever bought for A.L. and that she and the Defendant argued about it.  R.M. stated that she gave the ring to A.L. and that A.L. told R.M. "it was just so that she knew somebody loved her."

A.L. testified that the Defendant bought her two rings; she received the first ring when she was thirteen or fourteen years old.  A.L. affirmed that the Defendant told her to look for it inside the shoes R.M. brought her.  A.L. understood the ring to be a "promise that [they] would be together forever."  A.L. wore it every day until it broke, then the Defendant replaced it.  A.L. stated that she understood the second ring to have the same significance as the first, and she wore it every day until she disclosed the abuse.

R.M. stated that the first ring broke about one month before Christmas and that around Christmastime, she was in Virginia when the Defendant called and told her that he took A.L. to buy a second ring.  R.M. stated that she "didn't like the whole thing of it" and that the ring was "a single diamond," which looked "more like a promise ring or engagement ring, especially for a teenager."  R.M. questioned A.L. about why the ring did not resemble her old one, and A.L. stated that she preferred the new one.

A December 17, 2015 Marks & Morgan Jewelers receipt reflected that the Defendant purchased a "Fashion Diamond RG" for $99.00.[10]  R.M. and A.L. identified the Defendant's handwriting in a photograph of a handwritten note, which reflected the following:

Subject Ring

---

[8] A word was cut off at the margin of the photograph.

[9] Letters were cut off at the margin of the photograph.

[10] A January 11, 2015 Kay Jewelers receipt with the Defendant's name was also received as an exhibit, but it was unclear from the testimony whether the purchase was related to A.L.

I bought you a promise ring because we can't get engaged due to reasons you already know.  this has been a rough month for me but I still want all the things this ring stands for.  I do still love you with all my heart.  If you put this ring on you are saying you will not kiss, touch, flirt or do anything with any[11] other male and will not let them do anything with you.  this also means you give your love, body, and mind to me.  You need to show your affection to me let me know you are happy with your man want him, his heart and body.  this also means I will have the same loyalty to you.  If you do not want me, love me or if you are just saying this to play me do not take my ring.  This is real not a game will you accept my ring.

### iii.    Tire Shop Photograph

A photograph of an image on a computer tablet showed A.L. sitting at a table in the tire shop break room and facing away from the camera.  A.L. was wearing a long-sleeved red top, blue jeans, and boots, and her legs were tucked underneath her such that her rear end was turned toward camera and prominently featured.

A.L. testified that the Defendant took the photograph on his iPad and showed it to her.  She noted that the Defendant "said that he liked how good [her] butt looked in [her] jeans that [she] was wearing."  A.L. stated that she knew the photograph was taken when she was fourteen years old and a freshman in high school because she had dyed her hair at that time and was wearing a school uniform top.

### iv.    Rubber Inc. Poem

Another photograph showed a handwritten note on "Rubber-Inc." letterhead; A.L. and R.M. identified the Defendant's handwriting.  The note read as follows:

The grass is usually green
The sky is usually blue
All day long I have thought of you
I see your smiling face hear you laugh
Thinking of our past present future
How I loved you before you started to mature

R.M. testified that in 2014, she also found the poem on the Defendant's desk at work.  When confronted, the Defendant claimed he "was doodling for a friend" but did not say for whom he wrote it.  R.M. noted that the Defendant had written her poems during their relationship and that she suspected several times that the Defendant was cheating on

---

[11] This word was circled in the note.

her. R.M. said that she would have interpreted the poem as evidence the Defendant was cheating on her except for the inclusion of the line "before you began to mature." R.M. stated that the poem gave her no indication of the identity of the person with whom the Defendant was cheating. She photographed the note using her cell phone, and she noted that the physical copy went missing.

A.L. identified the poem as a note the Defendant slipped into her backpack. When A.L. arrived at home, she found the note, and the Defendant asked her if she received it.

v.   *Text Messages*[12]

R.M. testified that during one of A.L.'s summer visits to Illinois, she noticed more telephone calls occurring between A.L. and the Defendant. When R.M. checked the family's cell phone records, she saw that the Defendant and A.L. had exchanged between six hundred and eight hundred text messages in one month.

R.M. testified that late on the evening of June 19, 2016, she and the Defendant arrived home after dropping off A.L. at her grandmother's house for the summer. After the Defendant fell asleep, R.M. took the Defendant's cell phone and searched it. R.M. averred that she was looking for evidence of the Defendant's talking to other women to determine if a possibility of reconciliation existed.

R.M. testified that the call log and text messages were "wiped clean" of exchanges R.M. had noted in the cell phone records as potentially being from other women. R.M. stated that she continued searching the phone because she was curious about the Defendant's communications with A.L. By this time, A.L. had "cut [R.M.] out" and refused to tell R.M. any details about her life. R.M. was aware that A.L. told the Defendant everything, but the Defendant would not convey any information to R.M., instead stating only that that A.L. was "fine."

Ultimately, R.M. found "well over a thousand" text messages exchanged between A.L. and the Defendant from April 13, 2016, to June 19, 2016. R.M. identified a "very, very small portion" of the text messages she found on the Defendant's cell phone; the first message was dated April 13 at 12:58 p.m., and the last message was time-stamped "Sunday at 11:16 p.m."[13] R.M. gave the Defendant's cell phone to Investigator Tipton at 9:00 a.m.

---

[12] The majority of the text messages contain spelling or grammatical errors, as well as slang and abbreviations. We have not corrected errors or replaced abbreviations when the message's meaning is otherwise clear.

[13] R.M. stated that June 20, 2016, was a Monday and that as a result, the time-stamp on the final messages referred to Sunday, June 19, 2016.

on June 20. R.M. denied altering the text messages or their dates, averring that the Defendant had a "Windows" cell phone, a system with which she lacked familiarity.

A.L. affirmed that the photographs and time-stamps accurately reflected messages she and the Defendant exchanged. A.L. stated that she and the Defendant sent text messages to one another "[a]lmost all the time that [they] weren't together" beginning when she was a freshman in high school.

The April 13, 2016 conversation consisted of the Defendant's reminding A.L. that she would be released early from school and questioning whether she "forgot [him]" because she did not respond. A.L. replied that she had not had a chance to respond and that she had seen his messages. The next message from the Defendant read, "I really hope u r not lying I really do want us to make it. I hope your not as heartless as u mom and screw me over. I am a good man to u." A.L. replied, "I'm not o want go make it to I'm not like her I know u are." The Defendant replied, "I liked that u answered the whole text thx if I put this behind us u have to promise it wont come out to be true later and when I ask for stuff then u will give it I want this and our issues to be gone forever." A.L. responded "They will be it will all be fine."

The Defendant replied, "U going to give me stuff when I ask for it?" After a few minutes, the Defendant wrote, "No response?" A few minutes later, A.L. replied, "Yes." The Defendant sent a smiling emoji. [14] A.L. wrote, "Not everything I ask for." The Defendant wrote, "No takebacks u said yes [smiling emoji]." A.L. wrote, "Oh hush." The Defendant sent a screen-shot of their text message conversation, and A.L. responded with illegible emojis.

On April 14, A.L. sent the Defendant a message that she loved him. The Defendant replied, "Love u bunches hope yesterday meant something to u it did to me." A.L. responded, "it did love u." The Defendant said, "At least u can say u make church folks leave stuff on the fence." A.L. responded, "Lol ok." The Defendant replied, "they heard u screaming and moaning lmao." A.L. responded, "Shut up." The Defendant responded, Hope u have a great day I truly do love u[15] and hope u . . . [k]eep your promise and stay true. No lies and no cheating." A.L. testified that the Defendant referred to the "church people" cunnilingus incident in these messages.

---

[14] Merriam-Webster defines "emoji" as "various small images, symbols, or icons used in text fields in electronic communication . . . to express the emotional attitude of the writer, convey information succinctly, [or] communicate a message playfully without using words[.]" MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/emoji (last visited July 30, 2020).

[15] The photograph was cut off here; R.M. testified regarding the last line of the message.

On April 22, the Defendant sent a "poem" to A.L. that described fellatio. A.L. replied, "Wow that one was dirty lol" followed by emojis of a laughing face and smiling face.

On another occasion, the Defendant sent a photograph of A.L. to her with the message, "This is my BAe[16] and I love her so much. She is pretty nice and all mine," followed by a smiling emoji.

On May 4, the Defendant sent A.L. a "poem" describing cunnilingus. The poem's last two lines read, "Its not about sex but the family and future I need[,] Although I can't wait until I get inside u and plant the seed." A.L. replied, "Oh wow that was sexual [surprised emoji]." A.L. testified that "plant[ing] the seed" referred to A.L.'s having the Defendant's children, which the Defendant discussed often.

On May 10, the Defendant sent the following message to A.L.:

Missing u thinking of my sweetheart
Hope your having a great day and hope we don't part
She is awesome and great this girl of mine
I know I will love her for all time
She is [A.L.] my one and true
My friend lover and will be my kids mother to

On May 11, the Defendant sent the following message to A.L.:

Her smile her face I love it all
She cant really help she is 5 feet tall
We laugh we love and we r there for each other
She is the one for me I wouldn't want another
4 years ago we started with a game
Who would have known from that nothing would be the same

A.L. testified that Defendant's reference to a game was to the shower and picture games.

On June 14 at 2:22 a.m., the Defendant sent a message to A.L. that read, "U woke me to [perform cunnilingus]; didn't wake me to say sorry or to tell me u love me. You never even kissed me today. I will let u get your sleep so u rested for tomorrow." A.L. replied, "Ok well I'm sorry goodnight love you." The Defendant responded, "Night love u not suppose to go to bed mad." The Defendant sent another message a few minutes later

---

[16] Merriam-Webster defines "bae" as a slang term for "baby" or "sweetheart." MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/bae (last visited July 30, 2020).

that read, "U could have fixes us I don't feel u wanted to and u could have came to my room to say goodnight but didn't. Last one had to say that." A.L. replied, "Ok we will talk about it tomorrow." About twenty minutes later, A.L. sent another message that read, "So even after all of this you don't love me anymore." Later that day at 3:14 p.m., the Defendant sent A.L. a message that read, "I miss u a bunch and am sorry for yesterday. I was hoping u would fix it but still hate we didn't have fun and fought."

On June 15, the Defendant sent a message that read, "Tv down please love u bunches," followed by emojis of kissing lips, a groom, a heart, and a bride. Later that morning, the Defendant and A.L. exchanged text messages about which of them loved the other more.

On June 18, the Defendant sent A.L. a message that read, "We still in your town u mom went to her brothers then we sat and talked at clock tower shell. She still saying I cheated on her." A.L. replied, "Yea ik she won't ever stop saying that idk." The Defendant responded, "I just hope u always know we r the only thing I did. How is your stay so far." A series of messages marked as sent on "Sunday" in the early morning hours reflected a groom emoji, heart emoji, and bride emoji from the Defendant, and two baby emojis from A.L.

A.L. testified that when the Defendant sent emojis of a bride and groom, they symbolized A.L. and the Defendant, respectively. A.L. stated that when she sent two baby emojis, it symbolized their two future children.

Later that night, the Defendant sent A.L. a message reading, "Just glad to be home and just hope u come home stay true and that your not playing with me." A.L. responded, "Yea ik I'm doing everything right." The Defendant replied, "Hope so [groom emoji, heart emoji, bride emoji] night." A.L. responded, "[Two baby emojis] Night."

In response to the contents of the text messages, R.M. went to the police department and was told to photograph the messages and return in the morning. R.M. testified that she also sent A.L. photographs of some of the messages, called her, and asked for an explanation; A.L. did not respond. R.M. spoke to A.L.'s grandmother on the telephone and conveyed her belief that the Defendant was abusing A.L. R.M. stated that A.L.'s grandmother "stayed on" A.L. and asked her more questions; after about thirteen minutes, A.L. disclosed the abuse to her grandmother and R.M., who was still on the telephone. R.M. denied threatening A.L.; she stated that she told A.L. that she was a victim, that she did nothing wrong, and that the Defendant was at fault.

## 5. The Defendant's Police Interview

Investigator Tipton testified that on June 20, 2016, and June 29, 2016, she interviewed R.M. Investigator Tipton also observed A.L.'s forensic interview. On June 29, 2016, R.M. gave Investigator Tipton the first ring the Defendant gave A.L. On July 1, 2016, R.M. brought Investigator Tipton the second ring, condoms, and two bottles of personal lubricant. R.M. testified that she had previously seen one of the bottles of personal lubricant in the Defendant's dresser drawer, but that when she searched the house after A.L. disclosed the abuse, the bottle was in the garbage can. R.M. stated that she and the Defendant never used condoms or lubricant when they were sexually active.

On June 29, 2016, Investigator Tipton went to the Defendant's house and interviewed him. The Defendant's audio-recorded police interview was received as an exhibit. In the recording, the Defendant stated that he had worked at the tire shop for twelve years and that he ran the "retread shop." The Defendant noted that A.L. was with her grandmother and that R.M. was with her mother, both of whom lived in Illinois.

In the recording, the Defendant stated his belief that Investigator Tipton was there because R.M. stole his cell phone. The Defendant did not know why R.M. stole the phone but guessed it had to do with "suspicion." The Defendant affirmed that R.M. had "always" thought he was cheating on her during their twelve-year relationship. The Defendant said that R.M. moved out all her belongings on A.L.'s fourteenth birthday after an argument with A.L.'s half-brother, leaving both her children with the Defendant. The Defendant stated that A.L.'s half-brother and R.M. had never gotten along and that they fought about R.M.'s refusing to pick up his high school class ring.

In the recording, the Defendant stated that A.L.'s father "left" the previous July after an argument with A.L. about her talking to the Defendant on the telephone. The Defendant stated that "they" had accused the Defendant of having sex with A.L. for "years." The Defendant denied having had sex with A.L. and noted that A.L. had been examined by a doctor when she was age twelve and fourteen and that A.L.'s hymen was intact. When asked why R.M. and A.L.'s father thought the Defendant would have sex with A.L., the Defendant responded, "The way [A.L.] acts." He stated that A.L. sent him text messages "all the time" and that in R.M.'s opinion, A.L. tried not to anger the Defendant; the Defendant noted that he did not agree with that assessment.

The Defendant denied that either A.L. or her half-brother viewed him as a father figure, stating that neither one called him "dad" and that their respective fathers were involved in their lives. The Defendant said that he did not understand why R.M. and A.L.'s father were "seeing stuff" based upon A.L.'s behavior. The Defendant agreed that A.L. had "[s]omewhat" of a "school-girl crush" on him and that she had "said things" to him about wanting to marry the Defendant and have sex with him when she was older. He

further agreed that A.L. wanted him to leave R.M. The Defendant said, "I told her[,] once she is eighteen . . . . I ain't going to jail and losing everything I got."

In the recording, the Defendant acknowledged that he was separated from R.M. and that she had a boyfriend. He stated that "Junior," referring to A.L.'s half-brother, was a rebellious teenager who did not like the Defendant's rules and had moved out. The Defendant stated that two weeks previously, R.M. was not "clean" and that she told him she was "on pills." The Defendant did not know what kind of pills R.M. took; he stated that he had seen her drink alcohol and become intoxicated in front of A.L. He noted that "[w]hen she left she got in a real bad way and . . . got with a bunch of different guys[.]"

The Defendant agreed that after the separation, R.M. left A.L. with him "a lot of [the] time" on weekends. The Defendant stated that he "tried to make up for" A.L.'s parents; he cited as an example his giving A.L. money at an arcade. The Defendant noted that R.M. chastised him and believed he gave A.L. money "to make [R.M.] look bad." The Defendant noted that his own mother left when he was four years old and that the "void was never filled."

The Defendant recounted that on A.L.'s fourteenth birthday, R.M. called him and asked if he would pick up A.L. from school. R.M. told him that she was "done" and that she had removed her things from the house. The Defendant stated that he picked up A.L. and told her that R.M. left. The Defendant said that A.L. cried while they sat on the couch and that they eventually went out to dinner with R.M. for A.L.'s birthday. The Defendant noted that the event reminded him of his own mother's leaving and that he knew how A.L. felt but could do nothing to stop it from happening.

The Defendant stated that R.M. thought that he "pushed" A.L. away from R.M., which the Defendant denied. He stated that he urged A.L. to communicate with R.M. but that A.L. did not want to talk to R.M. because she left. The Defendant said that he told A.L. she was a "better person than that." The Defendant agreed that R.M. resented A.L. He stated that R.M. had a bad childhood, did not "have anything," and fought with her mother because R.M. did not know her father's identity. The Defendant opined that R.M. was jealous of A.L.

The Defendant described A.L. as "an awesome kid" who was happy every day. He said that he drove A.L. to and from school and that he sometimes took her to the tire shop. When asked why R.M. did not pick up A.L., the Defendant stated that he did not know. He recounted an incident in which R.M. picked up A.L.'s half-brother and his girlfriend at school but refused to pick up A.L. at the same time. The Defendant stated that A.L. was upset that her mother was picking up her "new daughter" instead of A.L. When asked if A.L. "cri[ed] to" the Defendant often, he responded negatively.

-22-

The Defendant stated that R.M. told A.L. that she was "going to the authorities" regarding the Defendant's relationship with A.L. The Defendant opined that R.M. wanted money from their divorce because she was in debt after spending a large sum of money during their separation. The Defendant claimed that R.M. told him that if he loved A.L., he would agree for their house to be sold. The Defendant stated that he would do anything for A.L., protect her, get her things she needed, and "fix" her emotional pain.

In the recording, Investigator Tipton opined that A.L. was "hurting" because she was proud of her romantic relationship with the Defendant; Investigator Tipton stated that A.L. questioned whether the Defendant was proud of her because she was not allowed to tell anyone about the relationship in spite of the Defendant's saying he loved her and wanted to have children with her. The Defendant responded, "After she's eighteen." The Defendant stated that everything A.L. told Investigator Tipton was false.

The Defendant asked if "she" gave Investigator Tipton his cell phone, and Investigator Tipton answered affirmatively. The Defendant stated that "a lot of things on that phone . . . ain't [sic] true." The Defendant denied knowing what was on the cell phone, although he also said that "different things" were on the phone. Investigator Tipton referenced the poem in which the Defendant stated, "I can't wait to place my seed inside of you and start our family together." The Defendant responded, "But that's after the age of eighteen. That's not now."

The Defendant stated that he was "not one to do anything that [Investigator Tipton would] arrest [him] for" and that "[m]ost of" what was on the cell phone was "not reality." The Defendant denied that references to "hand jobs" were on the cell phone and stated that he knew of "two poems" that would "cause problems." He then stated that there were "several other poems" and that he "just sent poems." The Defendant said that the poems did not reference "stuff she had done or hadn't done" and that he sent the poems to make A.L. laugh. The Defendant acknowledged that two of the poems referenced "the oral stuff" and explained that he wrote them after A.L. watched a horror movie that was "a little provocative"; he noted that he stopped the movie and did not allow A.L. to finish it.

The Defendant stated that he did not want to risk losing his job and that although he would do anything for A.L., if he lost his job or went to prison he could not do anything for her "and she [knew] that." The Defendant stated that R.M. made it known that she was going to "turn the phone over" and that he called two attorneys because he did not want things he said in the cell phone messages to "get turned around." The Defendant said that he was worried about what the police thought had happened. The Defendant stated that he raised A.L., that A.L. made poor grades in school when R.M. lived with them, that the Defendant punished A.L. by taking away her electronics, and that A.L.'s grades had improved.

The Defendant agreed that A.L. believed that she and the Defendant lived together as husband and wife. However, the Defendant denied that he and A.L. "[got] intimately" with one another. When asked whether he was calling A.L. a liar, the Defendant responded negatively. When Investigator Tipton stated that the Defendant and A.L. were in a "dating relationship" involving fellatio, cunnilingus, and A.L.'s manually stimulating the Defendant's penis, the Defendant responded, "These are things you read on the phone."

When Investigator Tipton referred to A.L.'s ring, the Defendant denied that the ring was meant to represent a committed dating relationship. He explained that he bought the ring because he found notes from A.L.'s friends in her backpack in which the friends encouraged her not to hurt herself or "give up on life" even though R.M. treated A.L. poorly and her father did not care for her. The Defendant stated that the ring was meant to symbolize that someone loved A.L. and that "life's always worth living." The Defendant stated that he also bought pearl earrings for A.L. as a Christmas gift.

The Defendant stated that he knew A.L. had a "crush" on him. When Investigator Tipton said, "Ok. You do not feel that way about her," the Defendant responded, "I didn't say that." The Defendant stated that he would be willing to "have a life" with A.L. once she was eighteen years old if it was what she wanted, but he added, "What's the odds of that happening?" The Defendant admitted that he and A.L. had kissed on the lips, but specified that it was not "a lip-locked-passionate" kiss. He denied that he kissed A.L.'s neck or that he touched A.L.'s breast. The Defendant noted that it was impossible for anyone to kiss down A.L.'s neck because she "cringe[d] all over" when girls blew on the back of her neck at softball practice.

The Defendant admitted that A.L. touched his penis. When Investigator Tipton asked whether A.L. touched the Defendant's penis "skin to skin," the Defendant responded, "I worry if I answer all of these questions . . . it's going to be worser [sic]." The Defendant stated that one attorney had advised him not to answer any questions. The Defendant expressed concern that Investigator Tipton would "trick" him and distort his words; he stated that it did not matter if A.L. had lied and that he did not want Investigator Tipton to tell A.L. she was a liar. The Defendant said that A.L. had "been through a lot."

When Investigator Tipton stated that she knew A.L. was "saving herself vaginally" for the Defendant when she turned eighteen, the Defendant responded, "[H]ow's that wrong if I've not done anything with her?" When Investigator Tipton said that it "sp[oke] highly of" the Defendant that A.L. knew he was not in the relationship purely for sexual reasons, the Defendant stated that "the law [was] gonna make it look [like] something else." The Defendant said that R.M. wanted money and to have him "out of the picture." Investigator Tipton conveyed that A.L. had given a description of the Defendant's "very distinct" penis, and the Defendant asked if he needed to call a lawyer. Investigator Tipton stated that the Defendant was not under arrest.

In response to Investigator Tipton's commenting that A.L. was fifteen years old and not a child, the Defendant stated that A.L. was still a minor and that a person could not have sex with a minor. The Defendant stated that it did not matter how many times a person had sex with a minor, "the fact is [the person] did it[.]" The Defendant acknowledged that his cell phone contained "some bad things." The Defendant stated that Investigator Tipton was going to believe A.L. no matter what he said. He noted that R.M. had taken A.L. away for the past two weeks.

The Defendant stopped responding to Investigator Tipton's questions regarding "different games" he played with A.L., stating that he knew "how this work[ed]" and that the police were "already working on . . . warrants and all that stuff." He stated that "the lawyer" told him how "this" worked. The Defendant continued,

> . . . I'm gonna have to come up with bail money and everything else just cause of—I don't care what teenage girl goes in there and says you done this that or the other. You're getting arrested if they go in there and say it whether that's true or not. Man [sic] don't stand a chance in the world between women and gays and . . . [.]

The Defendant stated that Investigator Tipton only had the side of the story "that's been with [R.M.] for a week and a half." He said that R.M. had "blocked" A.L.'s cell phone and that no one aside from R.M. was allowed to speak to A.L.

When asked why A.L. would lie about having sex with the Defendant, he responded that A.L. wanted R.M. "back in her life more than anything in the world. Even though she acts like she don't [sic]." The Defendant denied, though, that A.L. lied to get R.M. back in her life; he stated that A.L. had been "coached a lot."

The Defendant acknowledged that he kept "some condoms" but that he knew the police did not get condoms from his house. Investigator Tipton stated that she could "get ya'lls [sic] DNA [off] of the couches" in order to obtain evidence of sexual activity.

The Defendant stated that it was "bull that a woman leaves her kid here" and questioned why R.M. left A.L. with the Defendant for one year if he "was so terrible, if . . . all this stuff was supposed to be going on." Investigator Tipton noted that they had questioned R.M. about her reasoning in light of R.M.'s acknowledgment that she had suspicions prior to reporting the abuse. The Defendant noted that no problems had arisen while the Defendant was financially supporting A.L.; he claimed that R.M. kept child support meant for A.L. He opined that R.M. was "wanting to come up with all this BS" because she had "all this debt."

Relative to the incident when R.M. saw A.L. coming out of the Defendant's bedroom, the Defendant stated that he could not "tell [Investigator Tipton] the truth" because he did not know with certainty what happened. The Defendant recalled going to bed around 2:00 a.m.; he noted that A.L. sometimes slept on the couch and that she was watching television when he went to bed. The Defendant said that he woke up around 7:00 a.m. to the house alarm's sounding, that he walked to the front door, that A.L. was standing at the alarm panel to disarm it, and that R.M. was at the door. The Defendant noted that he woke up alone, but he could not say whether A.L. was in the room while he was asleep. He stated that after R.M. arrived, he went back to bed and that A.L. walked in with a blanket wrapped around her. The Defendant said that he asked A.L. what she was doing in his bedroom and told her to leave because he was going back to sleep. The Defendant stated that R.M. later asked him what A.L. was doing and that he told her to ask A.L. because he did not know. He said that R.M. noted A.L.'s bed being "cold"; the Defendant told her that A.L. may have fallen asleep on the couch.

The Defendant admitted that A.L. had slept in his bed "a few times," but he averred that no sexual activity occurred there. He said that on those occasions, he and A.L. had separate blankets and that they were fully clothed. The Defendant said, "They told me all of this was gonna happen." He explained that his boss told him, "[Y]ou better get away from it. You know [R.M.] will do anything." The Defendant said that his best friend and people on his baseball team also warned him.

The Defendant stated that a difference existed between "doing stuff right and doing stuff wrong." He opined that it was not wrong "talking to a girl about a future." The Defendant described an occasion during which A.L. almost dated a boy at school, but ultimately rejected him after following the Defendant's advice on how to determine whether the boy was only interested in A.L. for sex. The Defendant said that he told A.L. that boys kept lists of the girls with whom they had sex and that virgins were a "plus" and kept on a separate list.

The Defendant stated that he sometimes took A.L. back to work with him after school and that she would sit in the break room and play on her computer tablet. The Defendant denied that his boss was concerned about the Defendant's behavior with A.L., and he told Investigator Tipton that she could ask anyone at work or "the ballpark" about his relationship with A.L. The Defendant denied that A.L. fellated him in the upstairs office during the summer. The Defendant stated that the allegations "[weren't] just [R.M.]. This [was R.M.], her Meemaw, and her aunt. All three of them [had] been hammering this girl for two weeks." The Defendant noted that A.L. was going to "say whatever they [told] her to say to get them to get off of her back." Investigator Tipton commented that in her opinion, A.L.'s report was not consistent with having been coached because of the level of detail A.L. gave. After hearing some of the details, the Defendant responded that he would

not place a sexual partner on the floor and that if he wanted to be alert to other people's entering the house, he would stay in his bedroom, which had a large window, as opposed to the living room.

The Defendant admitted that A.L. had seen his penis. He explained that on one occasion two years previously when R.M. was not home, he took a shower and caught A.L. watching him while hiding in a closet. He noted that "[q]uite a few times," A.L. looked at the Defendant's reflection in the mirror while he was in the bathroom. The Defendant maintained that he could not see A.L. when this occurred and that he thought she could not see him either. The Defendant stated that he informed R.M. about the spying and told her that he could not shower while A.L. was alone in the house with him and that they needed to determine why she was "doing this." He stated that around the same time, they discovered that when A.L. visited her father, she slept in the same bedroom as her father while her stepmother slept downstairs. A.L. told R.M. and the Defendant that several times, she awoke to find her father standing over her as she slept. A.L. also reported that after her father and brother showered, they walked naked down the hallway past A.L.'s bedroom. A.L. also complained that her father and brother walked in on her showering because the bathroom had a curtain instead of a door. The Defendant noted that R.M. went to family court regarding the incidents at A.L.'s father's house and that because of these issues, A.L. stayed with her grandmother.

The Defendant indicated that he masturbated alone on the living room couch, in his bed, and in the shower. The Defendant stated that the lawyer with whom he had spoken made him feel like "y'all gonna screw me over" and that he had said more than he was "supposed to say." The Defendant noted that if he had not spoken to the lawyer, he "probably would've answered all of [Investigator Tipton's] questions." The Defendant noted that he had an appointment to see the attorney because the Defendant "admit[ted] that there [was] a lot of stuff on [his] phone but . . . [i]t's not real."

The Defendant averred again that any of his acquaintances would tell Investigator Tipton "everything [was] fine." He stated that he had told people that R.M. thought that A.L. and the Defendant had a romantic relationship. The Defendant noted that R.M. and A.L.'s father had been telling A.L. for three years that she was in love with the Defendant. He stated that if "all [she] hear[d]" was that she was in love with the Defendant and both her mother and father left, A.L. was "probably gonna go exactly right [to what] they preached at her for three years." The Defendant denied that his relationship with A.L. "[went] to the next level."

The Defendant stated that R.M. told the Defendant's mother and a friend that she was going to give his cell phone to the police. The Defendant said that he told his boss that he "sent some text[s he] shouldn't have sent." The Defendant repeatedly stated that Investigator Tipton came into the interview already believing A.L. and R.M.

After the interview recording was played, Investigator Tipton testified that although she mentioned to the Defendant using a "black light" and testing for DNA in the home, she ultimately did not order the testing because the victim did not report the Defendant's having ejaculated on the couch. In addition, the possibility existed that the Defendant might have deposited DNA while masturbating alone.

### 6. Defense Proof

The Defendant presented one witness, Rebecca Mayes, who testified that she was an assistant coach and "ball mom" for A.L.'s softball team. Ms. Mayes never saw inappropriate behavior between the Defendant and A.L. Ms. Mayes noted that although she was close with A.L. and discussed R.M. and A.L.'s father with her, A.L. never reported the abuse to her. Ms. Mayes affirmed that the Defendant and A.L. appeared to have a close relationship and spent a lot of time together. Ms. Mayes said that R.M. attended about five of eighteen games per season and that R.M. came to one of A.L.'s practices so intoxicated that she could not stand. Ms. Mayes said that A.L. was embarrassed and concerned.

### 7. State's Elections

At the close of the proof, the State dismissed Counts 3 and 5, sexual battery by an authority figure, and made the following elections:

| Count | Event |
|---|---|
| 1 (aggravated sexual battery) | When A.L. was in sixth grade, sitting on the big couch with the Defendant and "he placed his hand on top of her shirt and then went underneath her clothing and inside her bra to touch her breast." |
| 4 (sexual battery by an authority figure) | "[T]he time when [the Defendant] touched the breast of [thirteen] year old [A.L.] in the living room of the family residence when the two were making out and [R.M.] returned home unexpectedly." |
| 6 (statutory rape by an authority figure) 17 (incest) 28 (rape) | When thirteen-year-old A.L. "performed fellatio on [the Defendant] in the living room of the family residence during the daytime, when the parties had not engaged in any kissing before the fellatio and [the Defendant] cleaned himself with napkins he had obtained before the sexual act." |

| | |
|---|---|
| 7 (statutory rape by an authority figure)<br>18 (incest)<br>29 (rape) | When thirteen-year-old A.L. performed fellatio on the Defendant in the shower of the "big bathroom" at night when no one else was at home. |
| 8 (statutory rape by an authority figure)<br>19 (incest)<br>30 (rape) | When thirteen-year-old A.L. performed fellatio on the Defendant in his truck after softball on "a curvy dark backroad [sic], after he had cleaned his penis at a gas station. [The Defendant] took sharp turns that caused his penis to go further in [A.L.'s] mouth. [The Defendant] threw napkins containing ejaculate out the truck window after the act." |
| 9 (statutory rape by an authority figure)<br>20 (incest)<br>31 (rape) | When thirteen-year-old A.L. performed fellatio on him in the break room at his work on a day after school when she had no softball. |
| 10 (statutory rape by an authority figure)<br>21 (incest)<br>32 (rape) | When thirteen-year-old A.L. performed fellatio on the Defendant in the upstairs room when he was on his lunch break. The Defendant was sitting in a chair, and A.L. was kneeling on the floor. The Defendant locked the door before the act. |
| 11 (statutory rape by an authority figure)<br>22 (incest)<br>33 (rape) | The Defendant inserted his finger into thirteen-year-old A.L.'s "genital opening" while she was inside the shower and he was standing outside the shower in the larger bathroom. |
| 12 (statutory rape by an authority figure)<br>23 (incest)<br>34 (rape) | The Defendant inserted his finger into thirteen-year-old A.L.'s "genital opening" while they were both standing inside the shower in the larger bathroom. |
| 13 (statutory rape by an authority figure)<br>24 (incest)<br>35 (rape) | The Defendant performed cunnilingus on A.L. in the living room, and the "church note" was left on the fence the next day. A.L. was fourteen or fifteen years old.[17] |

[17] We note that relative to Count 35, rape, the State had to prove that A.L. was "less than" fifteen years old. See Tenn. Code Ann. 39-13-501(1) (defining coercion). However, the text message in which the Defendant referenced the "church people" incident was dated April 14, 2016, which was before A.L.'s fifteenth birthday. The record reflects that the jury was properly instructed regarding the definition of coercion.

| | |
|---|---|
| 14 (statutory rape by an authority figure)<br>25 (incest)<br>36 (rape) | The Defendant performed cunnilingus on A.L. while she was lying on the break room floor in the Defendant's workplace. A.L. used the women's restroom on the same floor. A.L. was in eighth grade. |
| 15 (statutory rape by an authority figure)<br>26 (incest)<br>37 (rape) | The Defendant performed cunnilingus on A.L. on the bed in the upstairs room at the Defendant's workplace, and one other person was in the building. A.L. cleaned herself with napkins that were already upstairs. This occurred the summer after A.L. turned thirteen. |
| 16 (statutory rape by an authority figure) | A.L. turned fifteen and the Defendant "placed his lubricated penis in [A.L.'s] anal opening . . . while not wearing a condom, in the living room of the family residence, while both were in the floor." |
| 27 (incest)<br>38(rape) | The first time the Defendant anally penetrated A.L. a short time before her fifteenth birthday while wearing a condom, in the living room of the family residence while A.L. was on her knees in front of the couch and the Defendant was on his knees behind her. |

During closing arguments, the State explained to the jury that it did not need to make an election as to Count 2, solicitation of a minor, which referred to the Defendant's asking A.L. to photograph her breasts after he sent her a photograph of his penis. The State also argued that the rape charges were based upon coercion by use of parental, custodial, or official authority over a child less than fifteen years old. The prosecutor stated,

> This was her step-dad. She didn't say anything because she trusted him. She was confused. He used the fact that he was her dad in order to accomplish this. I would submit to you that . . . if they didn't have that relationship, that he would not have been able to engage in this particular activity.

## 8. Verdict, Sentence, and Appeal

The jury found the Defendant guilty as charged. At the sentencing hearing, Eileen Mason, the Defendant's stepmother; Lonnie Mason, the Defendant's brother; Barbara Copland, the Defendant's mother; and Doyle Mason, the Defendant's father, testified

regarding the Defendant's good character. Each of them stated that they had never observed inappropriate behavior between the Defendant and girls in their family. The elder Doyle Mason noted his disbelief that the incidents in this case occurred.

Deanna Houser, the Defendant's girlfriend, testified that she was twenty-one years old and that she had been dating the Defendant for almost two years. Ms. Houser stated that she suffered from severe mental health issues, including anorexia and bipolar disorder, and that she was "mentally disabled." She said that the Defendant ensured she kept doctor's appointments and took her medication. Ms. Houser averred that the Defendant was the first man she had ever trusted, that she had experienced sexual, physical, and mental abuse in the past, and that the Defendant never forced her to do anything she did not want to do. She stated that she was initially afraid of the Defendant, physically abused him, left him six times, and obtained an order of protection against him. Ms. Houser stated that she lied about the Defendant's physically abusing her in order to obtain the order of protection. Ms. Houser said that she found suitable housing for herself and the Defendant if he were released on probation.

The presentence report reflected that the Defendant had no previous criminal record and that the Defendant denied drinking alcohol or using drugs except for tasting alcohol on two occasions in his twenties and smoking marijuana once as a teenager. The Defendant's Strong-R assessment indicated a high risk for violence.

A.L. submitted a written victim impact statement, which stated that she had nightmares and "flashbacks," but that they had stopped when the Defendant was incarcerated. A.L. stated that the Defendant hurt her "in ways that [she] did not know [were] possible." A.L. stated that she was improving because she "learned how to work through the pain[.]" A.L. requested that the Defendant be sentenced to life in prison, stating that she would "never be able to forget the things he did . . . . No money, counseling, or jail time [would] take back what he did." A.L. noted that living with the Defendant was "like living in prison, never seeing [her] friends, never having a real boyfriend. [She] had prison at home and then [her] second life at school." A.L. concluded that she was happy now and "finally g[o]t to enjoy life now that [she was] finally free" but that she would carry this experience with her for the rest of her life.

The Defendant submitted a written statement to the trial court, which averred that the Defendant was "a very caring person" and that he understood that there were "a lot of charges and fines against [him.]" He apologized for "the inconvenience [he had] caused the court, [his] family or [A.L.] and her family." The Defendant stated that he always "tr[ied] to put others before [him]self" and requested to prove to the court that he was a good person. The Defendant noted that he had not attempted to contact A.L. or her family and stated that he would obey all conditions of probation because he did not want to go back to jail, which was "the hardest thing [he had] ever done." The Defendant said that he

could not pay his fines in prison and that he was willing to pay fines "indefinitely." The Defendant averred that he had "never run from [his] problems" and requested the court to consider his support system and the restrictions he would face as a probationer, including those related to registering as a sex offender. The Defendant stated that if he were granted probation, he "would not pursue appeals" because he wanted to move forward and did not want A.L. to "have to worry about appeals or going through courts again." The Defendant concluded by stating, "There is no winner in this case but hopefully we all can get it behind us."

The trial court stated that it considered the presentence report, the principles of sentencing, the testimony of the defense witnesses, the Defendant's and A.L.'s statements, and the arguments presented relative to mitigating and enhancement factors. The court noted that Count 1, aggravated sexual battery, was a nonprobatable offense. The court found that the Defendant was a Range I, standard offender. The court found relative to the probatable offenses that the Defendant was "not a good candidate" based upon the seriousness of the offenses and that probation would depreciate the seriousness of the offenses.

Relative to the length of the sentence, the trial court noted that Count 1, aggravated sexual battery, and Counts 28-38, rape, were Class B felonies and that the remaining counts were Class C felonies. The court declined to apply enhancement factor (1), that the Defendant had a history of uncharged criminal behavior based upon A.L.'s testimony regarding other incidents of penetration before she turned thirteen. See Tenn. Code Ann. § 40-35-114(1). The court noted that "it would not be appropriate to consider that testimony [for purposes of] enhancement" because "that was really more due to the fact that the [S]tate did not have a good understanding of when the penetration began[.]" The court also declined to apply enhancement factor (4), that the victim was particularly vulnerable due to her age, finding that no proof supported "something particular about that child's age . . . that made [her] particularly vulnerable." See Tenn. Code Ann. § 40-35-114(4). The court applied enhancement factor (7), that the Defendant committed the offense to gratify his desire for pleasure or excitement, only relative to the convictions for statutory rape, rape, and incest. See Tenn. Code Ann. § 40-35-114(7). The court declined to apply enhancement factor (8), that the Defendant failed to comply with the conditions of a sentence involving release into the community, because the Defendant only failed to comply with bond conditions.[18] See Tenn. Code Ann. § 40-35-114(8).

The trial court applied enhancement factor (14), that the Defendant abused a position of private trust, and gave it "a great deal of weight." See Tenn. Code Ann. § 40-

---

[18] The record reflected that one of the Defendant's bond conditions was not to have contact with minor children. The State presented social media photographs taken during the Defendant's release on bond, which showed the Defendant at an amusement park with Ms. Houser, another woman, and a child.

35-114(8). The court noted relative to the rape convictions that "it's sort of a narrow definition between coercion and what happened here." The court found, though, that "there is a degree of abuse of a private trust above and beyond in this particular case what was necessary to coerce her into the act[.]" The court stated that this case was "the most emotionally manipulative case [the court had] ever seen where [the Defendant] clearly created in this young girl's mind this idea that she was being courted by [the Defendant] and that they were going to eventually . . . have this life together." The court stated that this was "really how he was able to accomplish this beyond what would be necessary for coercion."

Relative to consecutive sentencing, the trial court noted that any consecutive sentencing was discretionary based upon the convictions. The court noted that one factor it considered was that the Defendant was convicted of two or more offenses involving sexual abuse of a minor; the court further noted that multiple aggravating circumstances applied. See Tenn. Code Ann. § 40-35-115(b)(5). The court stated that the Defendant and A.L. had a "very close relationship," that she considered him to be her father, and that the Defendant was "living his life" in a father-figure role. The court found that the Defendant had controlled and manipulated A.L. by telling her that he wanted to marry her and have children with her. The court found that a familial relationship existed as well as a "very emotionally connected, sort of a dating relationship" that was "extreme and aggravated[.]"

The trial court found that the time span of the abuse was an aggravating factor, noting that "[t]he grooming, so to speak, probably began before age [ten], but at age [ten] we start[ed] to see this relationship turn into what it would become and went on for a number of years[.]" The court found that the nature and scope of the sexual abuse was aggravated, that "every type of penetration imaginable" occurred, and that the residual physical and mental damage to A.L. was aggravated. The court noted the victim's trial testimony and victim impact statement, finding that the victim suffered nightmares and flashbacks, that she felt like she lived in a prison for years, and that she would have to "carry this" with her for the rest of her life.

The trial court found that justification for consecutive sentencing existed and noted the statutory factors supporting a sentence to be served in confinement. The trial court noted that it sought to order a sentence that was "justly deserved in relation to the seriousness of the offense." The court found that the offenses were "extremely serious" and that the facts of the case involved extreme emotional and mental damage to A.L.

Relative to mitigating factors, the trial court found that the Defendant had no prior criminal convictions and gave this factor "a good bit of consideration." See Tenn. Code Ann. § 40-35-113(13). The court noted the character witnesses' testimony that the Defendant was a hard worker, but the court did not "think that one carrie[d] a lot of weight." The court found that the Defendant's employment history, which spanned most of his adult

life, in conjunction with his lack of criminal history "support[ed] his mitigation." The court found that the character witnesses' testimony about the Defendant's treating his family members well did not "serve as mitigation."

The trial court considered Ms. Houser's testimony and stated that in the court's opinion, Ms. Houser was "really another young emotionally troubled young lady who was taken advantage of by the [D]efendant in this case[.]" The court found that Ms. Houser was a young, vulnerable woman and that her testimony did not mitigate the Defendant's behavior "at all." The court noted its "great concern" that the Defendant exhibited "more predatory behavior." The court said that Ms. Houser's testimony contained "some interesting statements, including [that] he didn't force anything on her. When he wanted to do things she didn't want to do, he said no. That was very troubling to the court." The court stated that it was not "holding it against" the Defendant, but that the testimony did not "work" as mitigation.

The trial court noted the jury's "strong message" by setting maximum fines, stating that although the jury had "no role in sentencing," the court was "mindful" that the jury felt the Defendant's behavior warranted maximum fines. The court found that the enhancement factors "largely outweigh[ed]" the mitigating factors and that sentences "toward the top of the range" were appropriate. The court commented that it believed neither maximum sentences run consecutively nor all concurrent sentences were appropriate.

The trial court ordered a "hybrid sentence with partial consecutive sentencing," which was as follows:

| Count | Conviction | Felony Class | Sentence |
|---|---|---|---|
| **1** | **Aggravated Sexual Battery** | **B** | **12 years** |
| 2 | Solicitation of a Minor | C | 6 years<br>Concurrent with Count 1 |
| 4 | Sexual battery by authority figure | C | 6 years<br>Concurrent with Count 1 |
| 6 | Statutory rape by authority figure | C[19] | 6 years<br>Concurrent with Count 28 |

[19] Statutory rape by an authority figure was a Class C felony until July 1, 2016, when amended legislation took effect. See Tenn. Code Ann. § 39-13-532(b)(2014). The period specified in the indictment relative to statutory rape by an authority figure was May 1, 2014, until June 30, 2016.

| 7 | Statutory rape by authority figure | C | 6 years<br>Concurrent with Count 28 |
|----|-----------------------------------|---|----------------------------------|
| 8 | Statutory rape by authority figure | C | 6 years<br>Concurrent with Count 28 |
| 9 | Statutory rape by authority figure | C | 6 years<br>Concurrent with Count 28 |
| 10 | Statutory rape by authority figure | C | 6 years<br>Concurrent with Count 28 |
| 11 | Statutory rape by authority figure | C | 6 years<br>Concurrent with Count 33 |
| 12 | Statutory rape by authority figure | C | 6 years<br>Concurrent with Count 33 |
| 13 | Statutory rape by authority figure | C | 6 years<br>Concurrent with Count 35 |
| 14 | Statutory rape by authority figure | C | 6 years<br>Concurrent with Count 35 |
| 15 | Statutory rape by authority figure | C | 6 years<br>Concurrent with Count 35 |
| 16 | Statutory rape by authority figure | C | 6 years<br>Concurrent with Count 38 |
| 17 | Incest | C | 6 years<br>Concurrent with Count 28 |
| 18 | Incest | C | 6 years<br>Concurrent with Count 28 |
| 19 | Incest | C | 6 years<br>Concurrent with Count 28 |
| 20 | Incest | C | 6 years<br>Concurrent with Count 28 |
| 21 | Incest | C | 6 years<br>Concurrent with Count 28 |
| 22 | Incest | C | 6 years<br>Concurrent with Count 33 |
| 23 | Incest | C | 6 years<br>Concurrent with Count 33 |
| 24 | Incest | C | 6 years<br>Concurrent with Count 35 |
| 25 | Incest | C | 6 years<br>Concurrent with Count 35 |
| 26 | Incest | C | 6 years<br>Concurrent with Count 35 |

| 27 | Incest | C | 6 years<br>Concurrent with Count 38 |
|---|---|---|---|
| **28** | **Rape (fellatio)** | **B** | **10 years**<br>**Consecutive to Count 1** |
| 29 | Rape (fellatio) | B | 10 years<br>Concurrent with Count 28 |
| 30 | Rape (fellatio) | B | 10 years<br>Concurrent with Count 28 |
| 31 | Rape (fellatio) | B | 10 years<br>Concurrent with Count 28 |
| 32 | Rape (fellatio) | B | 10 years<br>Concurrent with Count 28 |
| **33** | **Rape (digital)** | **B** | **10 years**<br>**Consecutive to Counts 1 and 28** |
| 34 | Rape (digital) | B | 10 years<br>Concurrent with Counts 33 and 28 |
| **35** | **Rape (cunnilingus)** | **B** | **10 years**<br>**Consecutive to Counts 1, 28, 33** |
| 36 | Rape (cunnilingus) | B | 10 years<br>Concurrent with Count 33 |
| 37 | Rape (cunnilingus) | B | 10 years<br>Concurrent with Count 33 |
| **38** | **Rape (anal)** | **B** | **10 years**<br>**Consecutive to Counts 1, 28, 33, 35** |

The total effective sentence was fifty-two years at one hundred percent service. The trial court reduced the fine imposed to $38,000 in light of the lengthy sentence in confinement. Thereafter, the public defender was appointed as appellate counsel and filed the motion for a new trial, which was denied. The Defendant timely appealed.

ANALYSIS

On appeal, the Defendant argues (1) that the evidence was insufficient to support some of his convictions; (2) that there was a material and prejudicial variance between the bill of particulars and the State's election relative to Count 1; (3) that the trial court "took on the role of the prosecutor" by questioning the victim and by doing so, conveyed to the jury that the court found the victim credible; (4) that the court erred by admitting hearsay

evidence that the victim reported the abuse to others, including her grandmother, her mother, and a forensic interviewer; and (5) that the sentence imposed by the court was excessive. We will address each issue in turn.

## I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions in Count 1, aggravated sexual battery, relative to A.L.'s age; in Count 2, solicitation of a minor, relative to the Defendant's belief that A.L. would produce a lascivious exhibition of her breasts; and in Counts 28-38, rape, relative to coercion by use of parental authority on a child younger than age fifteen.[20] The State responds that the evidence is sufficient.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; see State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

A. Aggravated Sexual Battery

The Defendant contends that the A.L.'s age was not sufficiently proven in Count 1, in which the State elected the incident when the Defendant touched A.L.'s breasts while "making out" on the big couch when she was younger than age thirteen. The Defendant argues that "rule of cancellation" dictates that A.L.'s testimony regarding the timing of the

---

[20] The Defendant does not challenge the sufficiency of the evidence in Counts 4-27.

incident "can be given no weight" because she made inconsistent statements under oath. Alternatively, the Defendant argues that A.L.'s testimony cannot be reconciled to produce a timeline in which this specific incident occurred before her thirteenth birthday. The State responds that any inconsistencies in A.L.'s testimony were explained and that the evidence was sufficient to establish her age.

Aggravated sexual battery is defined, in relevant part, as the "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [when the] victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a). The indictments in this case reflect that the State elected A.L.'s age as the basis for the aggravated sexual battery charge.

Tennessee courts have recognized the rule of law "that contradictory [sworn] statements made by a witness as to the same fact can cancel each other out." State v. Caldwell, 977 S.W.2d 110, 118 (Tenn. Crim. App. 1997) (citing Taylor v. Nashville Banner Publ'g Co., 573 S.W.2d 476, 482 (Tenn. Ct. App. 1978)). The "rule of cancellation" addresses circumstances in which "the proof of [a] fact lies wholly with one witness, and he both affirms and denies it," resulting in no "evidence at all to prove the fact." State v. Matthews, 888 S.W.2d 446, 449-50 (Tenn. Crim. App. 1993) (quoting Johnston v. Cincinnati N.O. & T.P. Ry. Co., 240 S.W. 429, 436 (Tenn. 1922)). "However, this rule applies only when inconsistency in a witness's testimony is unexplained and when neither version of his testimony is corroborated by other evidence." Caldwell, 977 S.W.2d at 118.

In this case, any inconsistencies in A.L.'s testimony were explained by the passage of time and the continuous nature of the abuse. See State v. Finch, 465 S.W.3d 584, 604 (Tenn. Crim. App. 2013) (concluding that "any inconsistencies in [the witness's] testimony were explained by the fact that these events had occurred two years before the trial. [The witness] testified that he had trouble remembering the exact dates and how he gave the UPS Store receipts to the [d]efendant due to the passage of time" ), overruled on other grounds by State v. Menke, 590 S.W.3d 455 (Tenn. 2019). During cross-examination, defense counsel elicited testimony regarding A.L.'s trial preparation with the prosecutor. When asked by counsel whether she knew the significance of her age relative to the charges, A.L. stated the following: "Yes, but it's very hard for me to remember because it's been almost two years and I have tried to forget[,] . . . and it happened so much that I can't remember like exactly. That's why I have to give such a big time frame." As a result, A.L. "provided an explanation that the jury heard and could evaluate" regarding any inconsistency in her testimony. State v. Daniel Pottebaum, No. M2007-02108-CCA-R3-CD, 2008 WL 5397848, at *11 (Tenn. Crim. App. Dec. 30, 2008)

In addition, we disagree with the Defendant's argument that A.L.'s testimony directly conflicts with itself. The testimony in this case was voluminous—in part because the abuse was continuous and occurred over a period of years, and in part due to the structure of questioning on both direct and cross-examination. The end result was that the questioning—and consequently the testimony—did not follow a clear timeline. Our review of A.L.'s testimony indicates that any inconsistencies were indirect and able to be resolved by the finder of fact.

For example, the Defendant emphasizes in his appellate brief that A.L. "was directly asked whether the time [the Defendant] 'touched [her] breasts' occurred before age thirteen, and she said only[,] 'In the shower, yes.'" The Defendant argues that A.L.'s answer indicates that the couch incident occurred after age thirteen or that she did not recall whether she was twelve or thirteen, both of which would directly conflict with A.L.'s earlier testimony.

However, the Defendant takes A.L.'s answer out of context in this regard. In reference to "kissing and . . . sexual things," defense counsel asked A.L. if "all that occurred" after age thirteen, except for the shower game. A.L. responded, "Shower and the kissing." Defense counsel asked, "And the shower incident, you say that occurred before age [thirteen]; is that correct?" A.L. answered affirmatively. Defense counsel stated, "All right. And that would – did that include the time he touched your breasts?" A.L. responded, "In the shower, yes." A.L.'s confining her response to the shower incident was appropriate given the scope of the immediately preceding question; in short, her testimony did not necessarily conflict with her other testimony about the timing of the incident in Count 1.

A.L. first gave general information regarding the progression of her "relationship" with the Defendant, then refined her answers relative to specific incidents when requested. A.L. testified that when she was in sixth grade, the Defendant began kissing her on the lips and told her that they were boyfriend and girlfriend, which meant that they were supposed to engage in sexual activities together. A.L. said that she and the Defendant began doing "sexual things" when she was in seventh grade and between twelve and thirteen years old. The first sexual activity she named was manual stimulation, which happened after the shower game ended but before fellatio began. She did not recall whether any instances of manual stimulation occurred after she turned thirteen. She stated that after the manual stimulation occurred and when she was in seventh grade, the Defendant began to touch her vaginal area. A.L. stated that the Defendant began to touch her breasts a "little bit before" he began touching her vagina. Relative to the facts underlying Count 1, A.L. specifically testified that the incident on the couch when the Defendant touched her breast on top of her shirt and under her bra occurred when she was in sixth grade, which would have made her twelve years old at most. Because A.L. never testified whether the breast touching

happened before or after the manual stimulation, which occurred in seventh grade, and she also testified that the vaginal touching occurred in seventh grade, a possible inconsistency exists with her later testimony that the Defendant touched her breast in sixth grade. However, this type of indirect inconsistency or gap in the testimony is not the type of conflict the rule of cancellation seeks to address. As we noted above, A.L. explained the reason for any conflicts in her testimony.

Likewise, the Defendant cross-examined A.L. regarding her statement during the forensic interview that the first sexual activity was kissing and that she was uncertain whether it occurred before her thirteenth birthday.[21] After being asked whether, in light of her forensic interview, all sexual touching had to have occurred after she turned thirteen, A.L. responded by stating that the shower game and "the kissing" occurred before she turned thirteen. Any difficulty A.L. had in distinguishing "kissing" from "making out" was not an inconsistency of such a degree that this court would disregard her testimony. A.L.'s testimony was not clearly inconsistent and the reason for any inconsistencies was explained; the Defendant is not entitled to relief on this basis.

The Defendant's remaining sufficiency issue in Count 1 relates to the weight of the evidence and A.L.'s credibility. In the light most favorable to the State, A.L. testified generally regarding the time when the kissing and sexual touching started, and later she was asked to recall specific incidents of abuse. Although the Defendant correctly notes that A.L. said she was "twelve or thirteen" when the kissing and sexual touching began, relative to the incident elected for Count 1, A.L. specifically stated that it happened when she was in sixth grade, meaning that she was between eleven and twelve years old. It was the province of the jury to reconcile inconsistencies in the testimony. See Bland, 958 S.W.2d at 659. The jury, by its verdict, credited A.L.'s statement that the incident occurred when she was in sixth grade when she was younger than thirteen years old; we note that the jury was free to credit portions of A.L.'s testimony while rejecting others. See State v. Winters, 137 S.W.3d 641, 658 (Tenn. Crim. App. 2003) (concluding that "the jury's role as the trier of fact is to determine which portions of the evidence are illustrative of the truth relative to disputed events"). The evidence was sufficient relative to A.L.'s age in Count 1, and the Defendant is not entitled to relief on this basis.

B. Solicitation of a Minor

The Defendant contends relative to Count 2, solicitation of a minor, the evidence was insufficient to establish that by asking A.L. to photograph her breasts, he attempted to induce A.L. to engage in conduct that, if completed, would have constituted especially aggravated sexual exploitation of a minor; that is, production of child pornography. He argues that the evidence established only that he requested a photograph depicting "mere

---

[21] We note that A.L.'s forensic interview was not a sworn statement for purposes of the rule of cancellation.

nudity" and that as a result, the photograph he intended to receive did not contain "sexual activity" as contemplated by the statute. The Defendant further argues that without the photograph itself or detailed evidence describing it, it was impossible for the trier of fact to determine "whether [the Defendant]: subjectively intended for [A.L.] to produce a photograph that would qualify as child pornography." The State responds that the circumstances surrounding the photograph's production provided adequate proof of a lascivious exhibition.

The indictment in Count 2, solicitation of a minor, specified that the Defendant "did unlawfully and intentionally, by means of oral communication, directly, attempt to induce, a person, to-wit: [A.L.], the same being a person that [the Defendant] did know or should have known to be less than eighteen (18) years of age, to engage in conduct that, if completed, would constitute a violation by [the Defendant] of the offense of Especially Aggravated Sexual Exploitation of a Minor[.]" See Tenn. Code Ann. § 39-13-528(a)(8).

Especially aggravated sexual exploitation of a minor, known in common parlance as production of child pornography, occurs, in relevant part, when a person "knowingly promote[s or assists]" a minor in participating in the production of "material that includes the minor engaging in . . . [s]exual activity." Tenn. Code Ann. § 39-17-1005. Sexual activity includes the "[l]ascivious exhibition of the female breast[.]" Tenn. Code Ann. § 39-17-1002(8)(G). Our supreme court has noted that "mere nudity" is not sufficient to constitute a lascivious exhibition for purposes of the sexual exploitation of a minor offenses. See, e.g. State v. Hall, --- S.W.3d ---, M2015-02402-SC-R11-CD, 2019 WL 117580, at *9 (Tenn. Jan. 7, 2019) (quoting State v. Whited, 506 S.W.3d 416, 441 (Tenn. 2016)).

We disagree with the Defendant's assertion that the photograph or a detailed description of it was necessary to the jury's determination relative to solicitation of a minor. Unlike a conviction for especially aggravated exploitation of a minor, which hinges on whether the resulting material was a lascivious exhibition, a solicitation conviction, like a conviction for attempt, centers on the Defendant's subjective intent in the moment he asked A.L. to photograph her breasts; put another way, the jury must determine whether the Defendant intended for A.L. to produce a lascivious exhibition of her breasts, and not one depicting mere nudity. A.L.'s response to the request is irrelevant; as a result, the absence of the resulting photograph or a description thereof does not necessarily lead to a conclusion that the evidence was insufficient to support the solicitation conviction. Conversely, the context in which the Defendant made the request is highly relevant to his intent in soliciting the photograph, even though it would not be relevant to a determination of whether the resulting photograph was, in fact, lascivious. See Hall, 2019 WL 117580, at *13 ("Certainly we agree that criminal attempt necessarily focuses on the defendant's state of mind and not whether the completed video was actually lascivious") (citing United

States v. Sims, 708 F.3d 832, 835 (6th Cir. 2013); United States v. Vanderwal, 533 F. App'x 498, 502 (6th Cir. 2013)).

Our supreme court's opinions in Hall and Whited provide this court with guidance regarding some of the circumstances that may evince an intent to produce lascivious content. In Hall, the defendant hid a camera inside the victim's bedroom; the fully-clothed victim discovered the camera almost immediately upon reentering her bedroom after showering. 2019 WL 117580, at *1. The recording showed that the defendant had entered the bedroom, placed the camera such that a person's torso was visible from mid-thigh to shoulder, milled about, and left. Id. at *2. The court noted that the camera was not zoomed in such that the focal point of the shot was clearly a genital or intimate body part. Id. at *13. Because it was not clear that the defendant intended to capture more than mere nudity, the evidence was insufficient to establish that he attempted to produce a lascivious exhibition. Id. at *19. Likewise, in Whited, the defendant succeeded in recording his minor daughter and her friend in his daughter's bedroom and a bathroom in various states of undress. 506 S.W.3d at 419. However, our supreme court found that the evidence was insufficient to support his conviction for especially aggravated exploitation of a minor because the girls, who were unaware of the filming, did not engage in sexual activity or do anything more than shower or change clothes. Id. at 447. The Hall court discussed the factual similarities of that case with Whited, citing in particular the wide angle of the camera, the absence of sexual activity, and the victims' lack of awareness of the camera. 2019 WL 117580, at *13. The court also noted that "nudity combined with other factors—such as the nature of the nudity depicted, emphasis or focus on private body areas, [or] posing or coaching of the minor by the defendant . . . could be sufficient to make the depiction a lascivious exhibition." Id. at *9.

In this case, the Defendant sent or showed A.L. a photograph of his penis; when he told her that there was a body part she had not yet photographed, A.L. clearly understood that the Defendant was requesting a photograph specifically of her breasts. The Defendant's conduct was different than that of the defendants in Hall and Whited, who simply placed a hidden camera in the hope of capturing passing nudity. Given the context in which the request occurred, the fact that a direct request was made, and A.L.'s role in the photography, the evidence was sufficient for a rational juror to conclude beyond a reasonable doubt that the Defendant attempted to induce A.L. to produce a lascivious exhibition of her breasts. The Defendant is not entitled to relief on this basis.

C. Rape

Relative to the eleven rape convictions, the Defendant's sole sufficiency issue relates to proof of coercion. The Defendant argues that without evidence that he ordered A.L. to comply with the sexual penetration because he was her stepfather or that he

threatened to punish her, there is insufficient evidence that he <u>used</u> his parental authority to accomplish the rapes. The State responds that the victim testified that she complied with the Defendant's requests because he told her to do so and that she did not report the abuse because the Defendant told her he would get into trouble.

Rape is defined, in relevant part, as the "unlawful sexual penetration of a victim by the defendant or of the defendant by a victim [when] . . . [f]orce or coercion is used to accomplish the act." Tenn. Code Ann. § 39-13-503(a)(1). "Sexual penetration" means "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's [or] the defendant's . . . body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7). "Coercion" is defined, in relevant part, as "the use of parental, custodial, or official authority over a child less than fifteen (15) years of age[.]" Tenn. Code Ann. § 39-13-501(1).

A review of similar cases in this court indicates that for purposes of coercion, the use of parental authority can be proven without the explicit commands the Defendant argues are necessary. <u>See, e.g.</u>, <u>State v. Rodney Darnell Robinson</u>, No. M2019-00303-CCA-R3-CD, 2020 WL 1923152, at *21 (Tenn. Crim. App. Apr. 21, 2020) (concluding that rape by coercion using parental authority was sufficiently proven when the defendant was the custodian of two fourteen-year-old girls; the defendant digitally penetrated them after asking to examine their genital areas for educational purposes or hygiene; and it was "undisputed that, during this time period, [the d]efendant had custodial authority over [the victims]"); <u>State v. Perry Lewis Sisco</u>, No. M-2017-01202-CCA-R3-CD, 2018 WL 1019870, at *12 (Tenn. Crim. App. Feb. 21, 2018) (concluding, in relevant part, that rape by coercion using parental authority was sufficiently proven when the defendant asked his thirteen-year-old daughter to lie on his bed, penetrated her, and stopped when she objected; as well as when the defendant pulled down the victim's shorts as she slept, penetrated her, and did not stop when she objected, noting that the defendant had in both instances "used force or coercion through his parental authority"); <u>State v. Delbert Lee Harris</u>, No. 01C01-9705-CC-00177, 1998 WL 670403, at *3 (Tenn. Crim. App. Sept. 30, 1998) (noting relative to coercion that "[t]he defendant, the stepfather of the victim, penetrated her once when she was thirteen years old" and that "[t]he victim lived in his residence at the time and qualified as being in his custody").

We think that this court's opinion in <u>State v. Tarrants Chandler</u>, No. M2013-00279-CCA-R3-CD, 2014 WL 3055972 (Tenn. Crim. App. July 7, 2014), is particularly instructive. In <u>Chandler</u>, the defendant was convicted of ten counts of rape relative to his girlfriend's minor daughter. 2014 WL 3055972, at *1. The defendant sometimes lived with the family and initially had a stepfather-type relationship with the victim. <u>Id.</u> at *6. However, when the victim was between thirteen and fourteen years old, the defendant

-43-

cultivated a dating relationship with the victim that alienated her from her mother. Id. at *2, *6. The defendant began sexually abusing the victim when she was fourteen years old. Id. at *6. The defendant told the victim that after she turned eighteen, they would have a family, and he referred to her as his "Future Son's Mother." Id. at *6, *9. The victim denied that the defendant ever used violence to accomplish the sexual contact. Id. at *10. On appeal, the defendant argued both that he did not have parental or custodial authority over the victim and that the proof was insufficient to establish that he used any such authority to accomplish the rapes. Id. at *17. After concluding that the defendant had custodial authority over the victim, this court discussed the proof relative to coercion as follows:

> As the trial court noted at the sentencing hearing, there was no question that the defendant "had become kind of the father of this family, primarily a stay-at-home father, and used his position of trust in order to kind of put that wedge between [the victim] and her mother." While the victim testified that at the time the abuse was occurring she viewed the defendant as a boyfriend and enjoyed the sexual activity, she developed this view only because the defendant had been spending time with her as a father figure. As the trial court observed, while the victim was "mature, she was still a minor and [the defendant] was able to manipulate fully her emotions." There is no merit to the defendant's claim that he did not use his custodial relationship to facilitate the sexual activity. The defendant was a father figure to the victim and exploited this relationship to begin a sexual relationship with the victim . . . . [A] rational trier of fact could have found that a custodial relationship existed and was used to effectuate a sexual relationship.

Id.

In this case, there was no dispute that the Defendant had parental authority over A.L. The Defendant raised A.L. from the time she was three years old, and he was the only full-time parent in the home for at least one year after R.M. began spending time with her new boyfriend and traveling to Virginia on the weekends. The Defendant described in his police interview that he chastised A.L. for making poor grades in school and would punish her for falling asleep without turning off the television. A.L. agreed that she was not close with her father and that she viewed the Defendant as a second father. R.M. was able to leave A.L. in the family home while she pursued other interests because R.M. trusted the Defendant to take care of A.L. A.L. confided in the Defendant and trusted him because he was a father figure.

The Defendant abused his parental authority—a position of extraordinary trust—and began to groom A.L. to become a sexual partner at the age of eleven, if not earlier. He

-44-

gradually began to test the extent to which A.L. would tolerate sexual activity by playing the picture game and shower game when R.M. was not home—an opportunity he would not have had <u>but for</u> his parental relationship with A.L.  A.L. cooperated with the Defendant's assertion that they were in a romantic relationship because "that's what he told [her]" and because the Defendant was, for all intents and purposes, her father.  After convincing his minor stepdaughter that she was his "girlfriend," the Defendant similarly exploited the parental relationship to have sexual contact with A.L. at the tire shop after he picked her up from school, in the upstairs office during the summer, in his truck after softball games, and in multiple locations in the family home.

The trial court correctly noted that the Defendant engaged in "extreme emotional manipulation" to convince A.L. that she was in a healthy dating relationship, when in fact she was abused and controlled by the Defendant such that she felt her home to be a "prison."  In short, the Defendant's unfettered access to A.L. arose from his parental authority over her and, therefore, he used his parental authority to manipulate A.L. and accomplish the numerous incidents of rape for which he was convicted.  The evidence relative to coercion was sufficient, and the Defendant is not entitled to relief on this basis.

## II.  Bill of Particulars/State's Election

The Defendant contends that a prejudicial and material variance exists between the State's bill of particulars and its election in Count 1, aggravated sexual battery.  The Defendant acknowledges that no objection was raised during trial and requests plain error relief.  The State responds that the variance was not prejudicial or material.

Prior to trial, the Defendant filed a motion for a bill of particulars.  Relevant to the issues on appeal, the State responded by specifying that in Count 1, it referred to an incident in which the "Defendant touched the victim's breasts while she was in the shower in their home."  The time period specified in the indictment was November 1, 2012-April 30, 2014.  At trial, the State's election relative to Count 1 specified the incident in which A.L. was in sixth grade and the Defendant "placed his hand on top of her shirt and then went underneath her clothing and inside her bra to touch her breast" while sitting on the big couch in the living room.

The doctrine of plain error applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused must not have waived the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231. Even if all five factors are present, "the plain error must be of such a great magnitude that it probably changed the outcome of the trial." State v. Martin, 505 S.W.3d 492, 505 (Tenn. 2016).

This court has previously held that the purpose of a bill of particulars "is to provide the accused with sufficient information about the offense alleged in the indictment to permit the accused (a) to prepare a defense, (b) to avoid prejudicial surprise at trial, and (c) to enable the accused to preserve a plea of double jeopardy." State v. Shropshire, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000). A variance between a bill of particulars "and the evidence presented at trial is not fatal unless it is both material and prejudicial." Id. "A material variance occurs only if the prosecutor has attempted to rely upon theories and evidence at the trial that were not fairly embraced in the allegations made in the charging instrument." State v. Shropshire, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000) (citing State v. Mayes, 854 S.W.2d 638, 640 (Tenn. 1993) (citations omitted); State v. Ealey, 959 S.W.2d 605, 609 (Tenn. Crim. App. 1997)). A variance does not prejudice the defendant (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, and (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense. State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984).

This court has previously concluded that differences between a bill of particulars and a State's election of offenses do not constitute a material and prejudicial variance so long as the proof "substantially corresponded" with the information in the bill of particulars. State v. Osborne, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (concluding in the context of a motion for a mistrial that no material and prejudicial variance existed when the numbering of the bill of particulars differed from the State's election, but the bill of particulars substantially corresponded to the conduct alleged at trial; for example, one child victim testified that a certain incident occurred in the living room rather than a bedroom).

Likewise, in State v. Sanders, discrepancies existed between the bill of particulars and the State's election of offenses relative to several counts of the indictment. No. M2011-00962-CCA-R3-CD, 2012 WL 4841545, at *14 (Tenn. Crim. App. Oct. 9, 2012), aff'd, 452 S.W.3d 300 (Tenn. 2014). In Count 6, the bill of particulars alleged that the defendant touched the victim's breast with his hand, but the State's election and the proof reflected that the defendant touched the victim's genital area over her clothing; in Counts 7 and 8, the bill of particulars alleged that the defendant digitally penetrated the victim's vagina, but the State's election and the proof reflected that the defendant

penetrated the victim's vagina with his penis. Id. When considering the discrepancies, this court reasoned as follows:

> We conclude that despite the inconsistencies between the bill of particulars and the State's elections, the State provided [the defendant] with enough details of the offenses to allow him to prepare a defense. In light of the statutory definitions of the offenses, both the bill of particulars and the State's elections encompassed conduct that constitutes aggravated sexual battery and rape of a child. [The defendant] was protected from unfair surprise at trial. Finally, [the defendant] cannot be prosecuted twice for the same offenses alleged in this case. Double jeopardy prohibits subsequent prosecution of [the defendant] for offenses against the victim occurring within the time frame the State alleged in the indictment. State v. Jones, 953 S.W.2d 695, 700 (Tenn. Crim. App. 1996); State v. Anderson, 748 S.W.2d 201, 203 (Tenn. Crim. App. 1985). The bill of particulars provided [the defendant] the necessary protections to ensure due process.
> . . . .
>
> [The defendant] failed to demonstrate either during or after trial that he was prejudiced by the prosecution's election of offenses that involved different means of aggravated sexual battery or unlawful penetration than that described in the bill of particulars. See State v. Speck, 944 S.W.2d 598, 601 (Tenn. 1997). [The defendant] categorically denied the charges in his statement to law enforcement. He did not offer a defense geared toward those specific acts. See id. "Similarly, [the defendant] did not offer any defenses post-trial that he would have used at trial were it not for the specific [acts] set forth in the bill of particulars." Id.; see also . . . Ealey, 959 S.W.2d [at] 605 . . . (holding that [the defendant] "failed utterly" to demonstrate how he suffered prejudice by not offering on this appeal any defenses that may have been available to him were it not for the variances between the bill of particulars and the State's proof). Accordingly, we conclude that [the defendant] has failed to demonstrate that he was prejudiced in his defense at trial. He is not entitled to relief on this issue.

Sanders, 2012 WL 4841545, at *14.

The Defendant's case is analogous to the one in Sanders. The allegations in the bill of particulars relative to Count 1 placed the Defendant on notice that A.L. had reported that he had touched her breast in the family home; the indictment in Count 1 gave an approximate time period, and the aggravated sexual battery was based upon A.L.'s being less than thirteen years old. The State elected a different set of facts, but the elected proof, the couch incident, still alleged that an aggravated sexual battery occurred when the

-47-

Defendant touched A.L.'s breast when she was younger than thirteen. The Defendant was protected from subsequent prosecution related to the shower incident because the conduct occurred during the period specified in the indictment.

Given the lengthy time period involved and the details included in the bill of particulars, the Defendant cannot say that he was unfairly misled or surprised by A.L.'s testimony or the State's election. He similarly does not specify how his defense, which consisted of a general denial that he engaged in any of the conduct alleged, was hampered because he was not informed that the aggravated sexual battery would be based upon the couch incident instead of the shower incident. The Defendant, therefore, has failed to prove that an unequivocal rule of law was violated, and he is not entitled to plain error relief.

### III. Trial Court's Questioning A.L.

The Defendant contends that the trial court impermissibly commented on the victim's credibility by acting in the "role of the prosecutor" when it questioned her regarding specific incidents of sexual touching, thereby "step[ping] in and assist[ing] the State in presenting its evidence." The Defendant added at oral argument that he did not dispute the propriety of the court's clarifying the testimony or even acting to "fill[] in the gaps" in the testimony; rather, the Defendant's issue related to the court's "sending a message to the jury" that it found A.L. to be credible. The Defendant acknowledges that no contemporaneous objection was made, and he requests plain error relief. The State responds that the Defendant is not entitled to plain error relief.

Near the end of A.L.'s direct examination, the State requested a recess in order to "go back over some of these counts and make sure that we're okay." The State noted that it needed to "[shore] up a couple dates[,]" and the trial court noted that "[t]he sexual battery by authority figure things need to be distinguished too." After the recess, questioning resumed, and the prosecutor began to ask A.L. how old she was when certain incidents occurred. A.L.'s answers varied between specific incidences and patterns of what generally would occur. The trial court interrupted, and the following exchange occurred:

> THE COURT: I need to clarify that. So was there ever a time after you turned [thirteen] where you were in the living room and he was kissing you and touched your breasts that it didn't progress to something else, that it just stopped there, or did it always—
>
> THE WITNESS: Some—sometimes, yes.
>
> THE COURT: Sometimes it stopped there?
>
> THE WITNESS: Yes. Yes.

THE COURT: So is there any time in particular that you can think of where it just stopped there, like I remember one time . . . [a] certain TV show was on and he was touching my breasts and that's all he did, or I remember one time I was wearing a red sweater . . . and he did it and it didn't go any further?

THE WITNESS: There would be–my mom would come home and it would just–

THE COURT: It would stop.

THE WITNESS: It would stop, yeah.

THE COURT: So you remember a time your mom came home and –

THE WITNESS: Yeah.

THE COURT: --and it didn't go any further?

THE WITNESS: Yeah.

THE COURT: And was—did that happen more than one time that your mom came home and it stopped, or just one time that you can remember?

THE WITNESS: There was a couple of times.

THE COURT: Couple of times. All right. Between those two times, is there anything that makes you think of one different than the other, like . . . I remember one time it was still light out and we didn't expect her to be home, or something like—anything like that that can help you distinguish one particular time.

THE WITNESS: That one particular time, yes.

THE COURT: What is it about that time that –

THE WITNESS: Oh, it was dark out and my mom was supposed to be going to Virginia and then she—I don't really know what happened. She either changed her mind or she decided to come home and it was nighttime and we were sitting on the couch watching TV when it happened, and then . . . we heard a car door slam, and then he got up and looked and was like, "Your mom's home."

THE COURT: And he would try to touch your breasts at that time?

-49-

THE WITNESS: That we were making out and he was touching my breasts at that time.

THE COURT: Okay. And nothing else happened that time.

THE WITNESS: No, nothing.

THE COURT: And that was after you turned [thirteen]?

THE WITNESS: Yes.

THE COURT: Okay. Go ahead, General.

We conclude that the Defendant has not proven that a substantial right was affected by the questioning. See Page, 184 S.W.3d at 230-31. Unlike other cases in which a trial court's extensive or hostile questioning was found to be prejudicial in light of scanty evidence of guilt,[22] A.L.'s testimony was corroborated by a large quantity of physical evidence documenting the Defendant's relationship with A.L., including text messages, notes, and poems with references to explicit sexual acts and future planned children, as well as the Defendant's incriminating statements made during the police interview. Although A.L.'s credibility was an important issue, the record does not support the Defendant's argument that the case turned "entirely" on A.L.'s credibility. The evidence at trial was more than sufficient to establish the Defendant's guilt. We note that the relevant questioning comprised less than three pages of A.L.'s 118-page testimony and that the language of the court's questions did not reveal any animus toward the Defendant or sympathy toward the victim; likewise, the Defendant does not argue that the court's tenor or demeanor conveyed an emotion not evident in the transcript. Because the Defendant has not established that his substantial rights were affected, we conclude that he is not entitled to plain error relief on this basis.

## IV. Hearsay

The Defendant contends that the trial court erred by allowing indirect hearsay in the form of testimony that A.L. reported the abuse to other people, including R.M., A.L.'s grandmother, and the forensic interviewer. The Defendant acknowledges that no

---

[22] See, e.g., Collins v. State, 416 S.W.2d 766, 767 (Tenn. 1967) (holding that the trial court's improper questioning of the defendant was both lengthy and so hostile as to constitute a "quite rigid cross-examination"; our supreme court also noted that evidence of the defendant's guilt was "vague").

contemporaneous objection was made and requests plain error review. The State responds that the testimony was not indirect hearsay.

The Defendant argues that although "explicit questions about the details of [A.L.'s] conversation with others were precluded by objection," the "jury was still informed that [A.L.] had told them the substance of her allegations" and that this constituted indirect hearsay. The Defendant cites as examples R.M.'s testimony that she questioned A.L. for thirteen minutes about the text messages before obtaining "an answer," which implied an affirmative answer; A.L.'s testifying that she told her mother and grandmother about the abuse; and A.L.'s testimony about telling the forensic interviewer "what had happened" and her affirmation that she told the truth.

At the outset, we note that "rarely will plain error review extend to an evidentiary issue." State v. Jonathan Mitchell Grimes, No. W2014-00786-CCA-R3-CD, 2015 WL 3929694, at *10 (Tenn. Crim. App. June 26, 2015) (quoting State v. Ricky E. Scoville, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007)). Here, plain error relief is not warranted because the Defendant has failed to demonstrate that the decision not to object was not tactical and that his substantial rights were affected.

Relative to tactics, defense counsel could have reasonably chosen not to object to R.M.'s testifying about A.L.'s giving her "an answer"; part of the defense theory was that A.L. fabricated the allegations in order to please R.M., and allowing proof that A.L. only gave an affirmative answer after thirteen minutes of intense questioning furthered that theory. Likewise, relative to A.L.'s testimony that her statement to Child Help was truthful, defense counsel utilized inconsistencies from A.L.'s forensic interview on cross-examination to impeach her testimony regarding her age at the time of some of the incidents. Counsel could reasonably have allowed A.L. to aver that both her interview and trial testimony were true in order to discredit A.L. on cross-examination.

In any event, A.L. testified and was cross-examined regarding her version of events; the evidence of the Defendant's guilt was substantial and did not depend on A.L.'s having disclosed the abuse to R.M. and her grandmother. Any implication that A.L. had previously disclosed some unspecified version of events was harmless in light of the overwhelming evidence of the Defendant's guilt. Therefore, the Defendant has not proven that his substantial rights were affected by the admission of the statements. The Defendant is not entitled to plain error relief.

## V. Sentencing

The Defendant contends that the trial court imposed an excessive sentence, arguing that the court improperly found that the Defendant was "taking advantage" of Ms. Houser, which "doomed any efforts to obtain leniency." He also argues that because the Defendant

did not kill anyone and had no criminal history, a sentence "roughly equivalent to a sentence imposed for first-degree murder" was "far greater than deserved." The State responds that the sentence is not excessive.

The Sentencing Reform Act was enacted in order "to promote justice" by ensuring that every defendant "be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102. In order to implement the purposes of the Sentencing Reform Act, trial courts must consider several sentencing principles. The sentence imposed for an offense "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4). Thus, before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).

In this case, the record reflects that the trial court weighed the appropriate factors and evidence when imposing the Defendant's sentence. We note that the court specifically discussed its careful consideration of the length of the Defendant's sentence, including its concern that the sentence be "justly deserved in relation to the seriousness of the offense," and that the court believed neither maximum consecutive sentences nor fully concurrent sentences were appropriate.

The trial court correctly applied two enhancement factors—that the Defendant committed the offense to gratify his desire for pleasure or excitement, which only applied

-52-

to the offenses for which it was not an element, and that the Defendant abused a position of private trust. See Tenn. Code Ann. § 40-35-114(7), (14). The court applied "a great deal of weight" to factor (14), finding that the degree of abuse, which involved "the most emotionally manipulative case [the court] had ever seen," went "above and beyond" that necessary to prove coercion relative to the rape convictions. The court declined to apply enhancement factors (1), (4), and (8), that the Defendant had a history of uncharged criminal behavior, that the victim was particularly vulnerable due to her age, and that the Defendant failed to comply with the conditions of previous community release. See Tenn. Code Ann. § 40-35-114(1), (4), (8).

Relative to mitigating factors, the trial court found that the Defendant had no prior criminal convictions, which it gave "a good bit of consideration," and that the Defendant had a good employment history, which the court found "support[ed] his mitigation." See Tenn. Code Ann. § 40-35-113(13). The court found that the testimony regarding the Defendant's family relationships and work ethic did not mitigate his culpability in these offenses.

After hearing Ms. Houser's testimony, the court found that Ms. Houser was an "emotionally troubled young lady who was taken advantage of by the [D]efendant[.]" The court cited with concern the phrasing of part of Ms. Houser's statement, including that when the Defendant "wanted to do things she didn't want to do," the Defendant "didn't force anything on her." The court was troubled that the Defendant exhibited "predatory behavior" in choosing another romantic partner who was very young and emotionally vulnerable, and the court found that Ms. Houser's testimony did not serve as mitigating evidence. However, the court also stated that it did not consider Ms. Houser's testimony "against" the Defendant as evidence supporting enhancement.

As a preliminary matter, insomuch as the Defendant impliedly argues that the trial court used Ms. Houser's testimony to enhance the sentences or, alternatively, decline to apply more weight to the mitigating factors, a trial court's application or misapplication of an enhancement or mitigating factor in sentencing does not invalidate the sentence imposed. Bise, 380 S.W.3d at 706.

In any event, if the trial court improperly considered Ms. Houser's testimony as proof of the Defendant's risk to reoffend, any error was minimal in light of the ample support in the record for the court's determination that maximum, in-range sentences were proper. The court otherwise complied with all procedural requirements, including finding that multiple enhancement factors and two mitigating factors applied, as well as one factor supporting consecutive sentencing. The record reflects that the court carefully considered the purposes and principles of sentencing and that it based its decision to order a lengthy sentence in confinement upon the egregious circumstances of the offenses.

Although the Defendant does not explicitly raise a challenge to the court's imposition of partially consecutive sentencing, his general complaint relative to the length of the sentence indirectly implicates the decision to order consecutive sentencing.

When reviewing a trial court's imposition of consecutive sentences, "the presumption of reasonableness applies," which gives "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." State v. Pollard, 432 S.W.3d 851, 861 (Tenn. 2013). "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." Id. at 862 (citing State v. Dickson, 413 S.W.3d 735 (Tenn. 2013)).

The trial court correctly found that the Defendant was convicted of two or more offenses involving the sexual abuse of a minor; the court noted that the relationship between A.L. and the Defendant was "extreme and aggravated," that the abuse went undetected for years, that the Defendant was A.L.'s father figure from a young age, that the Defendant used his position of trust to accomplish the abuse through control and manipulation, that the abuse involved multiple types of sexual penetration, and that "extreme" damage to the victim's mental and emotional health resulted, noting that she would carry the abusive experience for the rest of her life. See Tenn. Code Ann. § 40-35-115(b)(5). We note that in addition, the Defendant's thirty-six felony convictions in the present case would have been enough, standing alone, to find that he had an extensive criminal record. Tenn. Code Ann. § 40-35-115(b)(2); see, e.g., State v. Cummings, 868 S.W.2d 661, 667 (Tenn. Crim. App. 1992) (holding that relevant to partial consecutive service, a defendant with no prior criminal history had an extensive criminal history due to eight felony convictions in that case).

Indeed, the trial court would have been justified in ordering full consecutive sentences in this case given the numerous aggravating circumstances and multiple Pollard factors present; we note that a fifty-one year sentence for a Range I offender is not unprecedented in child sexual abuse cases. See, e.g., State v. Nance, 393 S.W.3d 212, 235 (Tenn. Crim. App. 2012) (affirming the trial court's imposition of consecutive sentences in a case involving the sexual abuse of the ten or eleven-year-old victim by the victim's mother's "ex-fiancé" during the span of seven months, resulting in an effective sentence of sixty-four years; the defendant had one previous criminal conviction for assault); State v. James Allen Perry, No. E2015-01227-CCA-R3-CD, 2016 WL 2901817 (Tenn. Crim. App. May 13, 2016) (affirming the trial court's imposition of partial consecutive sentences in a case involving the years-long sexual abuse and exploitation of the minor victim, who was between ten and thirteen years old, by a family friend, resulting in an effective sentence of 106 years; the defendant had one previous drug-related conviction and one conviction for

violating a protective order); State v. Ricky Allen Hickman, No. M2013-02390-CCA-R3-CD, 2014 WL 4557626 (Tenn. Crim. App. Sept. 16, 2014) (affirming the trial court's imposition of consecutive sentences in a case involving the sexual abuse of a six or seven-year-old victim by her grandfather on three occasions, resulting in an effective sentence of forty-seven years; the defendant had no prior convictions other than one decades-old shoplifting charge). The court did not abuse its discretion in imposing partial consecutive service; the length of the Defendant's effective sentence is not excessive; and he is not entitled to relief on this basis.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE